2002 SD 129

**In the Matter of the ESTATE OF Cheryl D. HOFFMAN.**

**Nos. 22165, 22324.**

Supreme Court of South Dakota.

Argued Aug. 28, 2002.

Decided Oct. 16, 2002.

Michael J. Schaffer of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South

Dakota, Attorneys for appellant Jack Ehrich.

Drew C. Johnson, Aberdeen, South Dakota, Attorney for appellee Bruce Hoffman.

Scott Kuck, Aberdeen, South Dakota, Attorney for Children.

KONENKAMP, Justice.

◼ [¶ 1.] By statute in South Dakota, an automatic restraining order forbids divorcing spouses from transferring, encumbering, concealing, dissipating, or disposing of any marital asset. While her divorce was pending, the wife, knowing that she was terminally ill, conveyed real and personal marital property held in joint tenancy to herself as a tenant in common. She did this to prevent her estranged spouse from receiving all the marital property as a surviving joint tenant. When her will was later probated, the circuit court invalidated the conveyances as a violation of the statutory restraining order. Then, after the estate appealed, the court appointed two additional personal representatives opposed to the appeal, who would thereafter seek to dismiss it. Because our statutory divorce restraining order does not explicitly prohibit a spouse's conversion of property from joint tenancy to tenancy in common, we reverse and remand with directions. And because a circuit court does not have authority to effectively abort a pending appeal, we reverse that decision as well.

**Background**

[¶ 2.] After twenty years of marriage, Cheryl Hoffman sued Bruce Hoffman for divorce on October 14, 1999. In accord with SDCL 25–4–33.1, upon the filing and service of the summons and complaint for divorce, the parties were restrained from "transferring, encumbering, concealing or in any way dissipating or disposing of any marital assets, without the written consent of the other party or an order of the court." Cheryl was diagnosed as having terminal cancer shortly after the divorce began. On November 20, 1999, she executed a last will and testament, naming her four children as beneficiaries of all her property. She died on June 13, 2000, while the divorce was still pending.

[¶ 3.] One day before her death, Cheryl quitclaimed to her father, Jack Ehrich, her interests in (a) two parcels of real property of which she and her husband were joint tenants and (b) all the farm livestock, grain, equipment, and machinery, as well as miscellaneous personal property of which she and Bruce were joint owners. Then Jack Ehrich immediately quitclaimed all the property back to her. A bill of sale was drawn up and signed to memorialize these arrangements, and the deeds were recorded on the morning after her death. The effect of these successive "straw transactions" was to extinguish Cheryl and Bruce's joint tenancy in these properties, converting their ownership to that of tenants in common. Cheryl wanted her children to inherit from her directly, thus preventing Bruce from obtaining all the property through right of survivorship. To ensure that her wishes were followed, Cheryl named her father, Jack Ehrich, as the person to assume, after her death, the duties of her estate's personal representative.

[¶ 4.] In the probate proceeding, Bruce Hoffman sought an order nullifying the straw transactions, arguing that the initial transfer to Jack Ehrich violated the statutory restraining order. Ehrich responded that the straw transactions violated neither the letter, the spirit, nor the purpose of the temporary restraining order. The court ruled that the initial part of the straw transactions conveying property from Cheryl Hoffman to Jack Ehrich vio-

lated the temporary restraining order. Accordingly, the court vacated the transactions. The estate, through its personal representative, now appeals that order. *See* 15–26A–3.

[¶ 5.] While the question of the straw transactions was still pending on appeal, Bruce sought to remove Jack Ehrich as personal representative of the estate. Although finding no cause to remove Ehrich, the circuit court, on its own motion, ordered the appointment of Travis and Kayla Hoffman, the two adult children of Cheryl and Bruce Hoffman, as co-personal representatives. The court ruled that all decisions affecting the estate were to be taken by majority vote. As all four children testified that they did not wish to inherit their mother's property interests immediately, but preferred, instead, that their father inherit the whole of them, the effect of appointing Travis and Kayla Hoffman would be a decision to abandon the estate's appeal of the order invalidating the straw transactions. All four children had earlier signed a written objection to the appeal. The estate then appealed the order appointing Travis and Kayla Hoffman, arguing that the circuit court had neither authority nor jurisdiction in the matter.

[¶ 6.] We consolidated the two appeals and now consider the following issues: (1) Did the straw transactions dissolving the joint tenancy violate the statutory divorce restraining order prohibiting the parties from transferring, encumbering, concealing or in any way dissipating or disposing of marital assets? (2) Did the circuit court have authority to appoint two additional estate representatives if such order would interfere with the subject matter currently on appeal? Statutory interpretation is a legal question reviewed without deference to the trial court's decision. *Ridley v. Lawrence County Comm'n*, 2000 SD 143, ¶ 5, 619 N.W.2d 254, 257 (citations omit-

ted). Likewise, a question of jurisdiction or legal authority is also an issue of law to be reviewed de novo. *State ex rel. LeCompte v. Keckler*, 2001 SD 68, ¶ 6, 628 N.W.2d 749, 752 (citations omitted). Therefore, we review the two issues on appeal de novo.

## Analysis and Decision

### 1. The Straw Transactions

[¶ 7.] This case requires us to examine statutory language to decide whether Cheryl's straw transactions converting property held in joint tenancy to a tenancy in common violated the automatic restraining order in SDCL 25–4–33.1. Where possible, we give words and phrases in a statute their plain meaning and effect. *See Faircloth v. Raven Industries, Inc.*, 2000 SD 158, ¶ 6, 620 N.W.2d 198, 201 (citations omitted). When the language of a statute is clear, certain, and unambiguous, there is no need for interpretation: our sole function is to declare the meaning of the statute as clearly expressed. *Zoss v. Schaefers*, 1999 SD 105, ¶ 6, 598 N.W.2d 550, 552 (citation omitted).

■ [¶ 8.] According to SDCL 43–4–1, "Transfer is an act of the parties, or of the law, by which the title to property is conveyed from one living person to another." To decide to what extent property rights have been transferred from one person to another here, we examine the intent of the parties to the conveyance. *See Mamalis v. Bornovas*, 112 N.H. 423, 297 A.2d 660, 662 (1972) (citations omitted). The circuit court looked solely to the first transfer of the property from Cheryl to her father and disregarded the reconveyance of the property from her father back to Cheryl. When we view the two transfers together, we see that Cheryl intended to dissolve the joint tenancy and to hold title to the property as a tenant in common. She did not intend to convey the property to a third person permanently. Viewed holistically,

the straw transactions did not transfer title of the property "from one living person to another."

[¶ 9.] A joint tenancy exists when the four unities of time, title, interest, and possession are present. *See Zulk v. Zulk,* 502 N.W.2d 116, 118 (S.D.1993) (citations omitted). Destruction of one of the four unities terminates a joint tenancy and converts it into a tenancy in common. *See Schimke v. Karlstad,* 87 S.D. 349, 208 N.W.2d 710, 711 (1973). Under South Dakota law, a joint tenant with right of survivorship has the right to unilaterally terminate the joint tenancy at any time without the knowledge or consent of the other joint tenants. *Id.* A joint tenancy can be dissolved in several ways. *Matter of Estate of Steed,* 521 N.W.2d 675, 682 (S.D.1994) (citations omitted); *see also* W.W. Allen, Annotation, *What Acts by One or More of Joint Tenants Will Sever or Terminate the Tenancy,* 64 ALR2d 918 (1959). Although its use is becoming outmoded, one common law method for terminating a joint tenancy is to arrange a "straw" transaction, in which the grantor conveys the property to a third party who immediately conveys it back to the grantor.[1] *See* Wendy Evans Lehmann, J.D., Annotation, *Severance or Termination of Joint Tenancy by Conveyance or Divided Interest Directly to Self,* 7 A.L.R.4th 1268 (1981).

[¶ 10.] If a joint tenant has the unilateral right to sever a joint tenancy, then what effect did the statutory restraining order have in this instance? SDCL 25-4-33.1 provides, in part:

Upon the filing of a summons and complaint for divorce or separate maintenance by the plaintiff, and upon personal service of the summons and complaint on the defendant, a temporary restraining order shall be in effect against both parties until the final decree is entered, the complaint dismissed, or until further order of the court:

(1) Restraining both parties from *transferring, encumbering, concealing or in any way dissipating or disposing of any marital assets,* without [either (a)] the written consent of the other party or [(b)] an order of the court, except as may be necessary in the usual course of business or for the necessities of life ...

This measure obviously prohibits spouses from transferring assets while a divorce is pending, but courts interpreting similar language in temporary restraining orders have found that the purpose is not to freeze the parties' estate plans, but to forbid either party from dissipating marital property and removing marital assets from the jurisdiction of the court.[2]

---

1. The term "strawman" refers to a person "put up in name only to take part in a deal; a nominal party to a transaction; one who acts as an agent for another for the purpose of taking title to real property and executing whatever documents and instruments the principal may direct respecting the property." Black's Law Dictionary 1421 (6th ed 1990).

2. *See Lonergan v. Strom,* 145 Ariz. 195, 700 P.2d 893, 898 (Ariz.Ct.App.1985) ("[I]t is not the purpose of [the automatic orders] to freeze each party's estate plan as of the date of the filing of the petition for dissolution and thus insure that it will be effectuated without

alteration in the event one of the parties dies before entry of a final decree. The statutory intent is to forbid actions by either party that would dissipate the property of the marital estate or place it beyond the court's adjudicatory power in the dissolution proceeding."); *Dyer v. Dyer,* 87 S.W.2d 489 (Tex.Civ.App. 1935) ("to preserve the property involved in a divorce suit ... where the property is in danger of being ... removed ... or is of such character as may be placed beyond the reach of the court"); *Benson v. District Court,* 57 Idaho 85, 62 P.2d 108 (1936) ("enables the court to preserve the property from dissipa-

[¶ 11.] Although this is an issue of first impression in South Dakota, courts in other jurisdictions have answered the question whether a severance of a joint tenancy violates a temporary restraining order. These courts have uniformly held that one spouse may terminate a joint tenancy with the other spouse during the pendency of a dissolution action without violating the restraining order. *See Estate of Mitchell*, 76 Cal.App.4th 1378, 91 Cal.Rptr.2d 192, 202 (1999)[3] (unilateral transfer of property by decedent to convert joint tenancy into a tenancy in common did not violate automatic court order because it was not a "transfer" or "disposition" of property; right of survivorship is not "property"—it is a mere expectancy); *Lonergan*, 145 Ariz. 195, 700 P.2d 893 (straw transaction to sever joint tenancy did not violate automatic order); *In re Estate of Knickerbocker*, 912 P.2d 969, 976 (Utah 1996) (joint tenancy can be unilaterally terminated by one spouse and the termination of the joint tenancy does not violate court order against selling, encumbering, or mortgaging assets during pendency of dissolution proceeding). Indeed, we can find no case that prohibits this type of transaction while a divorce restraining order is in effect, and counsel has cited none.

[¶ 12.] Applying the same reasoning as these courts, we conclude that Cheryl Hoffman did not "transfer" marital assets in violation of the statutory restraining order by merely changing the form of her title. Looking at the straw transactions as a whole, we think it clear that her intent was not to permanently convey the property to a third party, but rather only to sever the joint tenancy. After the straw transactions, she continued to hold title to the property as a tenant in common with her husband. Because she did not "transfer" property as defined in SDCL 43-4-1, she did not violate the restraining order. SDCL 25-4-33.1. All the marital property conveyed in the straw transactions was still available for appropriate disposition, either in probate or, were it possible, in the divorce proceeding.[4] The court erred in concluding otherwise.

■ [¶ 13.] Although Cheryl did not "transfer" assets, did her straw transactions violate the restraining order by encumbering or dissipating marital assets? SDCL 25-4-33.1. Bruce argues that by conveying the property by deeds and a bill of sale to a strawman, the property became subject to automatic encumbrances: (1) any existing judgments would attach to Jack Ehrich's interest in the real estate however brief his ownership may have been;[5] (2) because there was a home on

---

tion, removal, or waste during the pendency and progress of the divorce action.").

3. The *Mitchell* court reasoned that severing a joint tenancy changes a mere expectancy and transfers no property. 91 Cal.Rptr.2d at 202. Thus, the court concluded that the California Legislature "did not believe that the provision prohibiting a transfer or disposition of 'property, standing alone, applied to such an expectancy.'" *Id.* (citations omitted). Following the *Mitchell* decision, in 2001 the California Legislature amended the statute to provide that "Nothing in this section restrains any of the following: (3) Elimination of a right of survivorship to property, provided that notice of the change is filed and

served on the other party before the change takes effect." *See* Cal Fam Code § 2040(b)(3).

4. Shortly after Cheryl's death, the divorce was dismissed by stipulation. Bruce still maintains the surviving spouse's right to an elective share of Cheryl's augmented estate. SDCL 29A-2-202.

5. When the deeds were recorded, they were claimed to be exempt from transfer fees imposed by SDCL 43-4-21 because Jack Ehrich was acting as a fiduciary under SDCL 43-4-22(15) (no transfer fee if between a fiduciary and a beneficiary if the transfer or convey-

one of the parcels and Ehrich's spouse did not sign the deeds, the real property became subject to a "homestead exemption" under SDCL 43–31–1; and (3) if the property was mortgaged, a "due on sale" provision might be triggered.

[¶ 14.] Bruce insists that to prevent these possible encumbrances, all the straw transactions must be invalidated from their inception. We think a more prudent solution is to remand the question to the circuit court for a determination whether, in fact, any encumbrance did attach to the property by virtue of some judgment against Ehrich, by a violation of a mortgage provision, or through a claim by Ehrich's wife to a homestead interest.[6] If any property was encumbered by Cheryl's transactions, thus violating the restraining order, then the court is empowered to void that particular transaction. Otherwise, if no encumbrance exists, the transactions are valid.

[¶ 15.] We think it vital to emphasize that our holding today should not be seen as an invitation to divorcing spouses to find creative ways to evade the statutory automatic restraining order. By far, the best procedure is for a party to seek consent from the other spouse or court permission before attempting any conveyance. Nonetheless, the language of our statute does not explicitly prohibit the transactions in question here.

## 2. Appointment of Additional Personal Representatives

[¶ 16.] After the estate appealed the first issue, the circuit court, on its own cognizance, appointed two additional representatives for the estate. These were the adult children of Cheryl and Bruce Hoffman. On the record, the children expressed their desire to end the appeal. Upon appointing these additional representatives, the court ordered that a majority vote would control all estate decisions. In so ruling, it was apparent that Jack Ehrich's decision to appeal the first issue could now be defeated by the two children's votes.

[¶ 17.] An appeal from a judgment or order strips the trial court of power over the subject matter of the judgment or order, and this Court has jurisdiction until the appeal is decided. *Matter of D.H.*, 354 N.W.2d 185, 192 (S.D.1984) (citations omitted). While circuit courts retain authority to act on matters collateral to the subject matter of the appeal and to enforce their judgments in the absence of a stay, judges may not enter an order having the effect of interfering with appellate review of a judgment.[7] *See* 15–26A–

ance is to accommodate the fiduciary relationship). Ehrich was not listed as a fiduciary on the deeds.

6. At least one court has held that an existing judgment does not become a lien on a strawman's interest in the property conveyed because the strawman acts as a mere conduit in the transaction. *United Loan & Inv. Co. v. Nunez*, 225 Ark. 362, 282 S.W.2d 595, 597 (1955). We need not reach that question because nothing the record suggests that any judgments existed against Ehrich at the time he acted as a strawman in this matter.

7. In considering similar questions, other courts have permitted further proceedings in the same case at the trial court level during appeal when the subject matter of the appeal would not be affected by such proceedings. *Matter of Tollefsrud's Estate*, 275 N.W.2d 412, 417 (Iowa 1979); *Majnaric v. Majnaric*, 46 Ohio App.2d 157, 158–59, 347 N.E.2d 552, 554 (1975); *Southland Corp. v. Village of Hoffman Estates*, 130 Ill.App.2d 311, 316–17, 264 N.E.2d 451, 454–55 (Ill.App.1970); *Hunter v. Hunter*, 44 Wis.2d 618, 620, 172 N.W.2d 167, 169 (Wis 1969); *Osborn v. Riley*, 331 So.2d 268, 271 (Ala.1976); *Blackmon v. Blackmon*, 525 S.W.2d 711, 713 (Tex.Civ.App. 1975). In these instances, the trial court is restrained from entering any order that would change or modify the judgment on appeal or

25. Therefore, we reverse the appointment of the two additional representatives.

[¶ 18.] Reversed and remanded with directions.

[¶ 19.] GILBERTSON, Chief Justice, and ZINTER, Justice, and AMUNDSON, Acting Justice, concur.

[¶ 20.] SABERS, Justice, concurs in result.

SABERS, Justice (concurring in result).

[¶ 21.] I concur in result because both of these appeals could have been avoided if Cheryl and her attorney had simply brought on an order to show cause to obtain the consent of the trial court to terminate the joint tenancies. There was ample time before her health deteriorated.

[¶ 22.] I agree with the admonition of the majority opinion (at paragraph 15) that "the best procedure [by far] is for a party to seek consent from the other spouse or court permission before attempting any [such] conveyance," but it should be *the rule for the future,* not simply *an admonition.*

have the effect of interfering with review of the judgment.