#24439-aff in pt, rev in pt & rem-SLZ

**2007 SD 132**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STEVEN LEE TOSH,                                    Plaintiff and Appellant,

  v.

KENNETH SCHWAB, individually
and in his official capacity as Chief
of Police for the City of Aberdeen;
STEVEN PIONK and DAVID LUNZMAN,
individually and in their official capacity as
detectives for the Police Department of the
City of Aberdeen,                                   Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JON S. FLEMMER
Judge

* * * *

DREW C. JOHNSON                                     Attorney for plaintiff
Aberdeen, South Dakota                              and appellant.

JACK HIEB of
Richardson, Wyly, Wise
 Sauck & Hieb, LLP                             Attorneys for defendants
Aberdeen, South Dakota                              and appellees.

* * * *

ARGUED ON OCTOBER 2, 2007

OPINION FILED **12/19/07**

ZINTER, Justice

[¶1.] The Aberdeen police erroneously suspected Steven Lee Tosh in the kidnapping and rape of a six-year-old girl (C.F.). Three police officers aggressively interrogated Tosh, placed him under twenty-four hour surveillance, and drilled holes in his vehicle's taillights in order to assist in the surveillance. The real perpetrator was eventually discovered and convicted. Tosh then brought this suit for intentional infliction of emotional distress and intentional destruction of private property. The jury found in favor of the officers on the former claim and for Tosh on the latter. The court, however, granted one officer's motion for a judgment notwithstanding the verdict on the intentional destruction of property claim. Tosh appeals. We affirm in part, reverse in part, and remand.

[¶2.] In the early morning hours of July 4, 1998, C.F. was abducted from her home and raped. Although her abductor left her for dead, C.F. found her way home. The police suspected Tosh, who had previously lived in the home from which the victim was abducted. Detective Lunzman was the lead investigator, Detective Pionk assisted, and Detective Schwab took over as Chief of Police in July of 1999.

[¶3.] Days after the incident, Lunzman interviewed Tosh. Tosh informed Lunzman that he was forced to move from the family home when his mother died, and the estate sold the house to C.F.'s parents. Tosh also informed Lunzman that on the morning of July 4, 1998, he woke up at 7:30 a.m. and went to work. Tosh further related that he had few friends, but one friend was David Blue.

[¶4.] About three months later, David Blue called the police department. Blue informed the police that Tosh: was infatuated with his old home and was very

upset when he was forced to leave; told Blue that he had re-entered the home after moving out; and, made comments to Blue about raping young girls. In December 1998, Lunzman interviewed Tosh and obtained a blood sample for DNA testing. The results of a mitochondrial DNA analysis[1] indicated that Tosh could not be excluded from the pool of possible perpetrators.

[¶5.] Tosh had a known history of psychological problems, including obsessive compulsive disorder. He suffered from depression and had suicidal tendencies. The officers conceded that they knew Tosh was suicidal. Lunzman even issued a memo to the surveillance officers that Tosh could commit suicide.

[¶6.] In August of 1999, after waiving his *Miranda* rights, Tosh admitted to Pionk that he drove by his old home prior to and after the abduction. He also did not dispute that he had no alibi for the date of the offense. When Tosh was confronted with Blue's allegation that Tosh made comments about raping little girls, he initially denied making such comments, but later stated that if he did make them, he was only joking. During this interview, despite Pionk's knowledge of Tosh's mental condition, Pionk allegedly told Tosh: (1) "If I did what you did I couldn't live with myself"; (2) "You'll end up going to hell"; and (3) "Since your mother is in heaven . . . you will never see your mother again because you'll be in hell."

[¶7.] The next month, Tosh took a polygraph. According to the examiner, the test revealed "significant criteria that would indicate deception" in some of

---

1.   Unlike nuclear DNA analysis, mitonchondrial DNA analysis does not allow
     for as many suspects to be excluded from the pool of possible perpetrators.

Tosh's answers. Pionk therefore interrogated Tosh further. In so doing, Pionk allegedly told Tosh that he was lying about the kidnapping and rape, and that Pionk knew Tosh was guilty.

[¶8.] Shortly after the polygraph, C.F. viewed a photo line-up that included a photograph of Tosh. C.F. did not identify Tosh as the perpetrator. A few days after the photo line-up, Lunzman spoke with Tosh's employer. Tosh's work schedule on July 4, 1998, indicated that, contrary to Tosh's initial interview, he was not working on that day.

[¶9.] On September 22, Blue told Pionk that Tosh recently made additional comments about having sex with little girls. The next day, Schwab ordered twenty-four hour, seven day a week surveillance of Tosh until nuclear DNA evidence could be obtained. Although the surveillance was set up to be covert, Tosh became aware of it, and on September 27 and 28, he complained to Schwab. Schwab refused to stop the surveillance.

[¶10.] According to Tosh, the surveillance included: following him when he would get groceries; sitting beside him in a movie theatre; following him into a public restroom; following him to his attorney's office; following him into the building where his Gambler's Anonymous[2] meetings were held; and following him to work. Tosh indicated that he felt as though he had no privacy, and therefore he stopped going out to most places.

---

2. In addition to the mental impairments already discussed, Tosh had a gambling addiction, and had written bad checks to support it.

[¶11.]     While surveillance was ongoing, Pionk allegedly read an article that discussed drilling holes in the taillights of suspects' vehicles in order to track them. After showing this article to Lunzman, they drove to Tosh's vehicle and Lunzman drilled holes in the taillights of Tosh's vehicle. The surveillance stopped on October 26, 1999, when Tosh turned himself into the Brown County jail to start serving a sentence for violating the terms of probation relating to bad check charges.

[¶12.]     On December 23, 1999, nuclear DNA tests indicated Tosh's DNA did not match the DNA from the rape scene. In spite of this test, Lunzman interrogated Tosh again. Lunzman accused Tosh of lying in a previous interrogation. Lunzman also accused Tosh of telling a third party that Tosh committed the crime but the police could not prove it.

[¶13.]     In January of 2000, the real perpetrator was discovered and ultimately convicted of the kidnapping and rape. Tosh subsequently brought this suit against the officers claiming intentional infliction of emotional distress for their tactics in the interrogations and surveillance. Tosh alleged that the officers acted improperly and outrageously, knowing of Tosh's psychological problems. Tosh also claimed intentional destruction of personal property for Pionk and Lunzman's drilling the holes in Tosh's vehicle's taillights. He sought compensatory and punitive damages.

[¶14.]     The officers retained a retired police officer as their expert concerning the propriety of their actions. Tosh retained John R. Gehm, Ph.D., to testify regarding proper police procedure in the area of interrogation and surveillance. Following a pretrial *Daubert* hearing, the trial court refused to allow Gehm to testify. Shortly thereafter, and before the trial date was set, Tosh moved to amend

the scheduling order to retain a replacement expert. The trial court denied this motion. Therefore, Tosh had no expert to support his claims or refute the officers' expert's opinion.

[¶15.]     Before trial, the officers moved for summary judgment. Without an expert to establish extreme and outrageous conduct, the trial court dismissed Tosh's claims for intentional infliction of emotional distress relating to the surveillance. The trial court also dismissed his claim for punitive damages, finding that Tosh did not show "willful, wanton or malicious conduct." Finally, the officers moved to limit Tosh's mental health professional from testifying beyond any opinions contained in her reports. The trial court granted the officers' motion.

[¶16.]     The jury found for the officers on Tosh's claim for intentional infliction of emotional distress relating to the interrogations. The jury found for Tosh on the claim for intentional destruction of personal property and awarded $1,000 against Pionk and $1,000 against Lunzman. After trial, the court granted Pionk's motion for a judgment notwithstanding the verdict on the property claim, finding that Pionk did not physically cause the damage to the vehicle. Tosh appeals raising the following issues:

> (1) Whether the trial court erred in precluding Tosh's expert from testifying regarding proper police procedure on interrogation and surveillance.
>
> (2) Whether the trial court erred in denying Tosh's motion to amend the scheduling order to obtain a replacement expert witness.
>
> (3) Whether the trial court erred in granting the officers' motion for summary judgment on the claims of intentional infliction of emotional distress relating to the twenty-four hour surveillance.

(4) Whether the trial court erred in limiting Tosh's mental health professional from opining beyond what was in her reports.

(5) Whether the trial court erred in prohibiting the jury from deciding the issue of punitive damages.

(6) Whether the trial court erred in allowing Pionk to testify regarding an article he read about drilling holes in a vehicle's taillights.

(7) Whether the trial court erred in granting Pionk's motion for a judgment notwithstanding the verdict on the issue of intentional damage to private property.

*Tosh's Expert*

[¶17.] Tosh claimed that the surveillance and interrogations were inappropriate police procedure and were intended to inflict emotional distress. To support this claim, Gehm was prepared to testify that the surveillance was more often "associated with a foreign police state," and that the interrogations included improper "psychological intimidation and coercion" that was "intentional, willful and outrageous." Following the *Daubert* hearing, however, the trial court granted the officers' motion to exclude Gehm's testimony. The court concluded that Gehm was not qualified to give an opinion in the area of police procedure in conducting surveillance and interrogations.

[¶18.] The admission of expert testimony is governed by SDCL 19-15-2 (Rule 702). This statute provides, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." SDCL 19-15-2.

> Under this rule, before a witness can testify as an expert, that witness must be "qualified." Furthermore, "[u]nder *Daubert,* the proponent offering expert testimony must show that the expert's theory or method qualifies as scientific, technical, or specialized knowledge" as required under Rule 702. Before admitting expert testimony, a court must first determine that such qualified testimony is relevant and based on a reliable foundation. The burden of demonstrating that the testimony is competent, relevant, and reliable rests with the proponent of the testimony. The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence.

*Burley v. Kytec Innovative Sports Equip. Inc.*, 2007 SD 82, ¶13, 737 NW2d 397, 402-03 (internal citations omitted). We review a trial court's decision to admit or deny an expert's testimony under the abuse of discretion standard. *Id.* ¶12, 737 NW2d at 402.

[¶19.] In this case, although the trial court agreed that Gehm's opinions were relevant, it found that Gehm's opinions were not based on a "reliable foundation due to his lack of qualifications as an expert in the area of police procedure[.]" The trial court noted that Gehm had a bachelor's degree in English and drama and a doctorate degree in sociology, as opposed to law enforcement. The court noted that Gehm had never worked as a law enforcement officer and had no training in police work. The trial court finally noted that Gehm taught political science and sociology for approximately thirteen years, and that his experience through his consultations and research over the years was in the areas of criminal corrections and treatment. Gehm's education, training and experience did not, however, relate to police surveillance or interrogations. In these areas, the court also found that: his opinions were not subjected to peer review; he had not published articles or books

on these subjects; and he was unable to articulate a standard that the officers should have followed in conducting their surveillance and interrogations.

[¶20.] On appeal Tosh argues that Gehm's opinions were based upon a reliable foundation, and that Gehm's experience and qualifications were similar to the expert who was deemed qualified in *Burley, supra*. *Burley* involved expert testimony on the issue of instructions and warnings in a products liability action involving sports equipment. The trial court found that the expert, a university professor, was not qualified to offer expert testimony on sports equipment even though he had "impressive credentials and expertise in a variety of [related] areas[.]" *Id.* ¶14, 737 NW2d at 403. This Court reversed, observing that the trial court "set the bar too high in determining the admissibility of the expert's opinion." *Id.* ¶1, 737 NW2d at 400. We reasoned that although his experience was not in the area of sports equipment, he had experience in the areas of instructions and warnings.[3] We concluded that a person with credentials and experience in product

---

3. We observed:

> [Plaintiff's expert] has had considerable experience in the evaluation of instructions and warnings. He published articles on the uses of computer assisted instruction in developing psychomotor skills related to heavy machinery operation; computer assisted instruction in applying psychomotor skill development; and the development of flight control skills in children. He has worked with companies in developing techniques for comparing the effectiveness of various vehicle signal and warning systems and the study and review of highway signage. He has also acted as a consultant in litigation on warnings and instructions on a tire and tire mounting machinery. He has supervised several doctoral dissertations on such subjects as evaluating operating manuals for snowplows and dump trucks, food nutrition labels, and the effect of

(continued . . .)

instructions and warnings for other products had the qualifications to render opinions regarding the instructions and warnings for sports equipment. *Id.* ¶23, 737 NW2d at 405.

[¶21.]     In contrast to *Burley,* this record reflects that Gehm had no experience regarding proper police interrogation and surveillance in any context. Although Gehm read some publications on these subjects, reading a book alone does not make a person a qualified expert. The trial court did not abuse its discretion in finding that Gehm's education, training and experience were insufficient regarding the matters at issue.

*Motion to Amend Scheduling Order*

[¶22.]     Tosh argues that the trial court abused its discretion in refusing to amend the scheduling order to obtain a replacement expert. SDCL 15-6-16 provides for scheduling orders, which provide a timetable to: join parties and amend pleadings, file and hear motions, complete discovery, schedule dates for pretrial conferences, and perform other tasks in the case. The statute specifically provides, "[a] schedule shall not be modified except by leave of the judge upon a showing of good cause." SDCL 15-6-16. We review trial court's ruling on these types of

_____

(. . . continued)
> instruction sets on performance on simulated navy ship operating systems. Apropos to this case, he is presently overseeing and directing a research project on manufacturer instructions for assembling and safely using tree stands for hunting. Under this study, three test groups of subjects are given different assembly instructions and monitored to measure which instructions provide improved assembly time and quality.

*Id.* ¶21, 737 NW2d at 405.

matters under the abuse of discretion standard. *See* Brooks v. Milbank Ins. Co., 2000 SD 16, ¶26, 605 NW2d 173, 180 (involving review of a motion for continuance).

[¶23.] In this case, the time for designating experts had already expired when Tosh's expert was disqualified. Therefore, Tosh moved to amend the scheduling order to retain a replacement expert. At the time Tosh made this motion, no trial date was yet scheduled.[4] Nevertheless, the court denied Tosh's motion. The trial court indicated that in a prior memorandum decision, it had noted that with respect to the scheduling order, "all that will remain from following this Memorandum Decision is to schedule a pre-trial hearing/conference and trial date." Because Tosh's motion did not relate to the pretrial hearing or trial date, the court ruled that its disqualification of Gehm did not constitute good cause for amending the scheduling order.

[¶24.] We conclude that the trial court abused its discretion in denying Tosh's motion to amend. Scheduling orders are not immune from amendment simply because a prior order only left pretrial hearing and trial dates to be set. Trial courts should take a broader view in evaluating good cause for an amendment. The most relevant factor in considering such amendments is usually the effect that the amendment will have on delaying the ultimate disposition of the case. We therefore believe the factors usually considered in granting continuances are particularly informative.

---

4. The officers agreed to amend the scheduling order pertaining to deadlines that had not yet passed, which included deadlines for taking the officers' expert's deposition and dispositive motions. The officers objected, however, to the amendment of deadlines that had already passed.

[¶25.]     In State v. Moeller, 2000 SD 122, ¶7, 616 NW2d 424, 431, this Court noted, "'[a] continuance may properly be denied when the party had ample time for preparation or the request for a continuance was not made until the last minute.' However, [a party] is entitled as a matter of right to a reasonable opportunity to secure evidence on his behalf." (Citations omitted). "If it appears that due diligence has failed to procure it, and where a manifest injustice results from denial of the continuance, the trial court's action should be set aside." *Id.* Other factors trial courts must consider in deciding whether or not to grant a continuance include:

> (1) whether the delay resulting from the continuance will be prejudicial to the opposing party; (2) whether the continuance motion was motivated by procrastination, bad planning, dilatory tactics or bad faith on the part of the moving party or his counsel; (3) the prejudice caused to the moving party by the trial court's refusal to grant the continuance; and (4) whether there have been any prior continuances or delays.

*Id.* ¶8, 616 NW2d at 431 (internal citations omitted).

[¶26.]     In this case, an expert opinion was critically necessary to Tosh's claims. Although Tosh had obtained an expert, that expert became unavailable only because the officers were successful in their *Daubert* motion. Thereafter, Tosh promptly moved to amend the scheduling order to permit the identification of a new expert. At this point, there would have been no delay or prejudice to the officers because the trial date had not yet been scheduled. In fact, the case did not go to trial until twenty months later, partly because Pionk was serving a military commitment in Iraq. Considering the totality of the factors, the trial court's denial of Tosh's motion to amend is reversed.

[¶27.]     Because we reverse on the expert witness issue, and because a replacement expert may have a significant impact on the surveillance and punitive damage claims, we also reverse and remand on issue three (summary judgment) and issue five (punitive damages).

*Limitation of Tosh's Mental Health Expert*

[¶28.]     Tosh's fourth issue is whether the trial court erred in limiting his mental health professional from opining beyond what was in her reports. As noted in issue one, we review a trial court's decision to admit or deny an expert's testimony under the abuse of discretion standard. *Supra* ¶18 (citing *Burley*, 2007 SD 82 at ¶12, 737 NW2d at 402). We discuss this issue to provide guidance on remand.

[¶29.]     Prior to becoming a suspect, Tosh was receiving mental health therapy. In 1999, Rhonda Fliehs, CNP, started providing counseling to Tosh. In response to a discovery request, Tosh disclosed Fliehs as an expert. The discovery request required Tosh to "state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." *See* SDCL 15-6-26(b)(4).[5] In response to this request, Tosh relied solely on the matters contained in Fliehs' reports.

---

5.     On appeal, Tosh argues that Fliehs was not his "expert." In his brief, however, Tosh indicates that "[i]n a set of Interrogatory questions, defense counsel asked plaintiff's counsel who his experts would be. Rhonda Fliehs was disclosed and copies of all her mental health records on Tosh were produced to defense counsel." We further observe that at trial Tosh stated: "[T]he reason I disclosed her as an expert is because in a professional sense she would be compared to a layperson that doesn't have her kind of knowledge. She's going to lay her foundation and disclose it accordingly. So

(continued . . .)

[¶30.]    Prior to trial, the officers moved to limit Fliehs' testimony to the facts and opinions disclosed in those reports. Because Fliehs' disclosed opinions were limited to those contained in her reports, we conclude that the trial court did not abuse its discretion in limiting Fliehs' opinions.

*The Article*

[¶31.]    Tosh's sixth issue is whether the trial court abused its discretion in allowing Pionk to testify regarding an article that led him to drill holes in Tosh's taillights. At trial, Tosh argued that such testimony constituted inadmissible hearsay. The trial court ordered that Pionk could not mention that he read a "Supreme Court case" that discussed this issue because it could impermissibly suggest that the practice was acceptable. The trial court did, however, permit Pionk to refer to "something they read in an article" to show their motivation. "Evidentiary rulings are presumed correct and are reviewed under the abuse of discretion standard." State v. Zakaria, 2007 SD 27, ¶22, 730 NW2d 140, 146.

[¶32.]    With respect to the article, Pionk ultimately testified:

> I didn't come up with the idea. . . . I read the article. I knew that the guys that Dave had lined out conducting surveillance were having trouble with Tosh dodging or losing the guys. . . . And I ran across this article and I said, well, here's a different idea and I gave it to him to review. . . . Dave said, let's go do this and I said ok.

Because Tosh claimed intentional infliction of emotional distress and sought punitive damages, the officers' motivation was in issue at trial. Furthermore, the

_____

(. . . continued)
in a sense that she's an expert to give those kind of opinions." Tosh's claim that Fliehs was not his expert is without merit.

article was not used to prove the legality of the officers' conduct. Although such references could easily become inadmissible hearsay, it was not so used in this case. Tosh has failed to show an abuse of discretion. Tosh also failed to show prejudice because the jury rendered a verdict in his favor on this claim.

*JNOV*

[¶33.] Tosh's seventh issue is whether the trial court erred in granting Pionk's motion for a judgment notwithstanding the verdict on the issue of intentional damage to private property. While not discussed by either party, the record indicates that the trial court entered its decision granting the j.n.o.v. after Tosh filed the notice of appeal. An appeal from a judgment strips the trial court of power over the subject matter of the judgment, and this Court has jurisdiction until the appeal is decided. Reaser v. Reaser, 2004 SD 116, ¶28, 688 NW2d 429, 437; *In re* Estate of Hoffman, 2002 SD 129, ¶17, 653 NW2d 94, 100; Ryken v. Ryken, 440 NW2d 307, 308 (SD 1989); Matter of D.H., 354 NW2d 185 (SD 1984)). Consequently, once a notice of appeal has been filed, a "trial court is restrained from entering any order that would change or modify the judgment on appeal or have the effect of interfering with review of the judgment." *Reaser,* 2004 SD 116, ¶28, 688 NW2d at 437-38 (citing *Hoffman*, 2002 SD 129 at ¶17, 653 NW2d at 100 n7*)*.

[¶34.] In this case, the trial court was without jurisdiction to consider the motion for judgment notwithstanding the verdict following the filing of Tosh's notice of appeal. Therefore, we do not consider the trial court's decision or analysis. The judgment notwithstanding the verdict is reversed.

[¶35.] Affirmed in part, reversed in part, and remanded.

[¶36.] GILBERTSON, Chief Justice, and KONENKAMP, Justice, concur.

[¶37.] SABERS, and MEIERHENRY, Justices, concur in part and dissent in part.

SABERS, Justice (dissenting on issue one).

[¶38.] The circuit court abused its discretion when it excluded Tosh's expert witness, Dr. Gehm. While it concluded Tosh's expert's testimony was relevant, it viewed the expert unqualified to testify because he "had no experience regarding proper police interrogation and surveillance[.]" *Supra* ¶21. Because the circuit court and the majority opinion mistakenly view the expert's qualifications too restrictively, we should reverse on issue one.

[¶39.] The majority opinion focuses on certain areas of Dr. Gehm's curriculum vitae to conclude "Gehm's education, training and experience were insufficient regarding the matters at issue." *Id.* However, this focus results in the exclusion of Dr. Gehm's experiences relevant to this case. While he may teach classes and write articles involving sentencing, prisons, victim-offender mediation and restorative justice, he also was a consultant for the South Dakota Law Enforcement Training Center. As a consultant, he assessed and established the eight-week Law Enforcement Basic Certification Course. Furthermore, he teaches classes entitled, "Policing in a Free Society," "Advanced Topics in Policing," and "Police Administration." Finally, he was a reviewer for "*Police Practice* and *Research: An International Journal*."

[¶40.]     As a part of his past training and current readings, Dr. Gehm has read many law enforcement articles, publications, books, and journals. These include "*Criminal Interrogation and Confessions* by Inbau and Reid, *The Techniques of Legal Investigation* by Thomas Publications, *The IACP*, policy papers including 'Interrogations and Confessions,' 'Standards of Conduct,' 'The Law Enforcement Code of Ethics,' and 'The Commission on Accreditation for Law Enforcement Agencies (CALEA)' to include 'Standards for Law Enforcement Agencies[.]" Many of these writings are the same writings the defense expert read and on which he based his opinion. Dr. Gehm has been called on in the past to testify as an expert in the area of criminal justice, is a professor of criminal justice and helped draft the curriculum used at the South Dakota Law Enforcement Training Center. To say that Dr. Gehm "had *no* experience regarding proper police interrogation and surveillance in *any* context" is simply not accurate. *See id.* (emphasis added).

[¶41.]     The circuit court viewed Dr. Gehm's qualifications to testify and the reliability of his testimony too restrictively. *Daubert* was intended to liberalize the admissibility of expert opinion testimony, keeping out only the "junk science." *See Burley*, 2007 SD 82, ¶24 n4, 737 NW2d at 405-06 n4 (quoting Weisgram v. Marley Co., 169 F3d 514, 523 (8thCir 1999) *aff'd*, 528 US 440, 120 SCt 1011, 145 LEd2d 958 (2000) ("Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony.")); *see also* Arcoren v. United States, 929 F2d 1235, 1239 (8thCir 1991) (the rule "is one of admissibility rather than exclusion"). Dr. Gehm's opinions, based on the same writings and reference materials as the defense expert, cannot be labeled junk science. While circuit courts are to determine whether the

expert testimony is "reliable" and "will assist the trier of fact," the "trial courts are 'gatekeepers,' not armed guards." The Honorable Janine M. Kern & Scott R. Swier, Daubert, Kumho, *and its Impact on South Dakota Jurisprudence: An Update*, 49 SDLRev 217, 243 (2003-04). "[T]he standard for qualifying a witness as an expert is permissive and liberally construed." *Id.* at 244.

[¶42.] Tosh had the burden of proving his expert's testimony was admissible "by a preponderance of the evidence." *Burley*, 2007 SD 82, ¶13, 737 NW2d 397, 403 (citing *Daubert*, 509 US at 592 n10, 113 SCt at 2796 n10, 125 LEd2d 469 n10). SDCL 19-15-2 provides that a person "qualified as an expert by knowledge, skill, experience, training, or education may testify . . . in the form of an opinion or otherwise." In other words, there is no requirement that the person actually be a [police officer] in order to be qualified to give [an] . . . opinion." *In re* T.A., 2003 SD 56, ¶26, 663 NW2d 225, 234. Dr. Gehm had experience in law enforcement training and techniques, through his training, reading and experiences consulting where he assessed, established and helped draft the curriculum for an eight-week Law Enforcement Basic Certification Course at the South Dakota Law Enforcement Center. These qualifications surely meet the "liberalized" standard of *Daubert*. Dr. Gehm's qualifications go to the weight the jury gives to the evidence, but should not prevent his testimony from being presented to the jury. Tosh demonstrated Dr. Gehm's testimony was relevant and reliable by a preponderance of the evidence and the circuit court abused its discretion when it excluded Dr. Gehm's expert testimony.

[¶43.]     Therefore, I dissent on issue one. I join the majority opinion in the other issues.[6]

[¶44.]     MEIERHENRY, Justice, joins this dissent on issue one.

---

6.     If the trial court is affirmed on this issue, the trial court should be given another opportunity to get it right on retrial. Only then will the trial court be able to maintain an even playing field.