#26720-aff in pt, rev in pt & rem-LSW

**2014 S.D. 76**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

ROGER HAMILTON,                            Plaintiff and Appellant,

    v.

RICHARD A. SOMMERS, MELISSA E.
NEVILLE and BANTZ, GOSCH &
CREMER, PROF., LLC,                Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
ROBERTS COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE GENE PAUL KEAN
Retired Judge

* * * *

DAN RASMUS
Minneapolis, Minnesota

    and

TIMOTHY L. JAMES
Yankton, South Dakota                Attorneys for plaintiff
                                       and appellant.

THOMAS J. WELK
JASON R. SUTTON
MEGHAN K. WOSTER of
Boyce, Greenfield, Pashby & Welk, LLP
Sioux Falls, South Dakota          Attorneys for defendants
                                       and appellees.

* * * *

ARGUED ON MARCH 24, 2014
OPINION FILED **10/29/14**

#26720

WILBUR, Justice

[¶1.]    Roger Hamilton appeals summary judgment dismissing his claims of legal negligence or malpractice and breach of fiduciary duty brought against his former attorneys.  We affirm in part, reverse in part, and remand.

## Background

[¶2.]    This case began as a dispute related to 112 bee sites located in Marshall, Roberts, and Day counties in northeast South Dakota.  In order to place bee hives onto private property, the hive owner must secure written permission from the landowner and file the permission slip with the South Dakota Department of Agriculture (Department).  Here, the 112 sites were previously registered to James Paysen.  Paysen sold the 112 sites in the mid-1990s to John Kelley; but significantly, Kelley did not register them.[1]  In 2006, Kelley sold the 112 sites to Adee Honey Farms, which was owned by Richard Adee.

[¶3.]    Around the same time as Adee's purchase, plaintiff/appellant Roger Hamilton, a local beekeeper, learned that Kelley was "going under."  Hamilton obtained an "abandonment map" from another local beekeeper (Mike Block) to determine what sites may be available.  Block also prepared and gave Hamilton a revocation form used to revoke a landowner's permission.  Using the map, revocation forms, and new permission forms, Hamilton acquired 10 bee sites formerly registered to Paysen on which Adee had unregistered hives.  Block, along

---

1.    "Sold" is a relative term because landowners may revoke permission to place bee hives on their property at any time for any reason.

with another regional beekeeper (Monte Amman), acquired the other 102 sites. Hamilton and Block drove together to Pierre to register their permission forms with the Department.

[¶4.]     Claiming the 112 sites as his own, Adee petitioned for an administrative hearing seeking to have the sites registered in his name. The hearing occurred on May 15, 2007. Hamilton, Block, and Amman prevailed; thus, the Office of Hearing Examiners found Hamilton had properly registered his 10 bee sites.

[¶5.]     Following the administrative hearing, Adee sued Hamilton, Block, and Amman on August 25, 2007, jointly and severally, for interference with business relations and/or expectancy, unfair competition, and civil conspiracy (Underlying Lawsuit). Seeking representation, Hamilton, Block, and Amman met with attorneys Richard Sommers and Melissa Neville of Bantz, Gosch & Cremer, L.L.C. (collectively "Appellees") on September 27, 2007, in Aberdeen, South Dakota.

[¶6.]     At the meeting, Appellees discussed the potential conflict of interest that could occur when representing all three defendants. Appellees asked whether Hamilton, Block, or Amman had insurance coverage that would compel the insurance carriers to respond to Adee's suit. Block and Amman replied affirmatively. Appellees wrote a demand letter to Block and Amman's carrier requesting that the insurance company defend the lawsuit, which the carrier

declined. Hamilton allegedly said he did not have insurance;[2] Appellees did not inquire any further. In hindsight, Hamilton did, in fact, have insurance in that regard. At the meeting's conclusion, Hamilton, Block, and Amman orally agreed to Appellees' representation.

[¶7.] On October 3, 2007, Appellees sent a letter to Hamilton, Block, and Amman confirming the joint representation and enclosing a conflict of interest waiver. Block and Amman signed and returned the waiver; Hamilton claims he never received, signed, or returned the waiver.

[¶8.] On July 7, 2009, Adee offered to settle solely with Amman if Amman transferred his bee sites to Adee and testified against Hamilton and Block in the Underlying Lawsuit. Appellees informed Hamilton, Block, and Amman of the settlement offer. Amman stated that he could not settle because, unbeknownst to Hamilton, Block, and Appellees, he had sold his business "including bee hive locations" on January 5, 2009, to Whetstone Valley Honey, Inc. (Whetstone). Amman's sale undercut the defense's theory that Adee had no legally protected interest in the bee sites because the permissive use was revocable at any time and, thus, the bee sites could not be sold. Additionally, the sale valued each bee site at approximately $5,000, allowing Adee to precisely state his alleged damages. Surprised by the sale, Appellees explained to the defendants that it was a major problem for their defense.

---

2.      Neville testified that at the meeting, Hamilton said he did not have insurance. Hamilton does not dispute that fact, saying in his deposition that he had a different insurance company and did not realize he had coverage.

[¶9.]        The next week on July 13, 2009, Judge John Flemmer held a pre-trial conference in the Underlying Lawsuit.  There, Judge Flemmer denied Appellees' motions to exclude evidence of Amman's sale and for a continuance to add witnesses who could explain the sale.  During the conference, Appellees recognized there may be a conflict of interest between defendants if evidence of the sale was presented stating: "there may be an irretrievable conflict now between Mr. Amman and the other two Defendants."[3]

[¶10.]        After the pre-trial conference, Appellees raised the possibility of settling.  Adee's demand was a settlement with all defendants or none.  Hamilton expressed reservations about settling, but, eventually, Hamilton, Block, and Amman signed a settlement agreement on July 17, 2009.  Under the settlement terms, Hamilton, Block, Amman, and Whetstone agreed to transfer their interests in the bee sites to Adee and to send landowners letters requesting they register their sites with Adee.  Additionally, Hamilton, Block, and Amman agreed to pay Adee $7,500 for honey delivery to the bee sites' landowners for the 2009 season.

[¶11.]        After the settlement, Hamilton hired a new attorney (John Wiles) and advised Appellees that he did not intend to comply with the agreement.  Block also hired new counsel (Lee Schoenbeck) and refused to comply with the agreement.  Adee moved to enforce the agreement, and during a hearing, Judge Flemmer

---

3.        Appellant's brief skews Sommers's testimony to say that he "acknowledged on the record that a conflict of interest existed."  But, review of the hearing transcript shows that Sommers stated a conflict of interest *may* occur if the evidence of the sale is admitted because defendants then may need to testify against each other.

rejected Hamilton and Block's argument that the settlement was unenforceable because of duress or fraud. As part of the court's findings of fact, Judge Flemmer specifically found that Hamilton had signed the conflict waiver form that Appellees claim they mailed to him. Hamilton did not appeal Judge Flemmer's decision.

[¶12.] On September 29, 2010, Hamilton sued Appellees asserting three causes of action: legal malpractice, breach of fiduciary duty, and negligent infliction of emotional distress, all based on an alleged conflict of interest relating to Appellees' representation of co-defendants Hamilton, Block, and Amman in the Underlying Lawsuit. On May 31, 2012, Hamilton amended his complaint adding an allegation of legal malpractice for Appellees' alleged failure to properly investigate whether Hamilton had applicable insurance coverage.

[¶13.] During discovery, Hamilton retained David Lillehaug, then a partner at a Minneapolis law firm, as an expert witness.[4] As to the conflict of interest claim, Lillehaug opined that the seriousness of the conflict between Hamilton, Block, and Amman made the conflict of interest non-consentable, and, even if it were consentable, Appellees breached the standard of care by failing to obtain informed consent from Hamilton. Also, Lillehaug opined that Appellees breached the standard of care by failing to withdraw or move for continuance when Adee offered to settle with only one defendant (Amman) when Amman's sale came to light. Lillehaug based his conflict of interest opinion on his practice under the

_____

4. During the pendency of this litigation, David Lillehaug was appointed to the Minnesota Supreme Court. At the time attorney Lillehaug gave his opinions, he was not a member of the Minnesota Supreme Court and will be referred to as "Lillehaug."

Model Rules of Professional Conduct Rule 1.7, and in his interpretation, its similarity with South Dakota's Rules of Professional Conduct Rule 1.7. Lillehaug testified, in his opinion, that "the standard of care with respect to conflict of interest . . . is essentially a national standard of care and that there is nothing unique about South Dakota in that regard." As to the insurance investigation claim, Lillehaug opined that Hamilton's statements that he had no insurance "warrant[ed] further inquiry and investigation." Lillehaug based his insurance investigation opinion on his career experience, which occurred almost entirely in Minnesota, and on information from other attorneys, including two attorneys licensed to practice in South Dakota (one based in Washington, D.C.).

[¶14.]    Appellees moved to strike Lillehaug's opinions asserting he applied the wrong standard of care to both the conflicted representation and insurance investigation claims. Appellees also moved for summary judgment asserting Hamilton's failure to meet his initial burden of presenting evidence to support his claims. Hamilton agreed to dismiss his negligent infliction of emotional distress claim.

[¶15.]    On April 15, 2013, the circuit court, Judge Gene Paul Kean presiding, granted Appellee's motion to strike, stating, Lillehaug "lacked adequate foundation to testify about the applicable standard of conduct" and his expert testimony would be "irrelevant, unhelpful to the jury, and confusing to the jury because his opinions [were] based upon a national standard of conduct[.]" The circuit court also granted Appellees' motion for summary judgment. On the conflicted representation claim, the court found Hamilton failed to provide sufficient evidence of proximate cause

and damages arising from the settlement. On both the conflicted representation and insurance investigation claim, the court found Hamilton failed to provide sufficient evidence of a breach of the standard of care because Hamilton failed to provide admissible expert testimony. The circuit court found that even if the expert testimony was admissible, Hamilton failed to provide admissible expert testimony that Appellees violated the standard of care applicable to attorneys in the same or similar locality as Roberts County, which the court determined to be a South Dakota statewide standard of conduct.

[¶16.]    Hamilton timely appeals, raising the following issues: (1) whether the circuit court erred in striking Lillehaug's expert opinion; (2) whether South Dakota should adopt a national standard of care for legal malpractice claims; (3) whether the circuit court erred in finding that collateral estoppel precluded litigation on the conflicted representation claim; (4) whether the circuit court improperly weighed the evidence as to the proximate cause of Hamilton's damages; and (5) whether the circuit court committed reversible error by denying a continuance after striking Lillehaug's testimony.

## Standard of Review

[¶17.]    "Summary judgment is an extreme remedy, . . . not intended as a substitute for a trial." *Discover Bank v. Stanley*, 2008 S.D. 111, ¶ 19, 757 N.W.2d 756, 762 (quoting *Cont'l Grain Co. v. Heritage Bank*, 1996 S.D. 61, ¶ 17, 548 N.W.2d 507, 511). Our review of summary judgment is well settled:

> We must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party

> and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*De Smet Farm Mut. Ins. Co. of S.D. v. Busskohl*, 2013 S.D. 52, ¶ 11, 834 N.W.2d 826, 831 (quoting *Brandt v. Cnty. of Pennington*, 2013 S.D. 22, ¶ 7, 827 N.W.2d 871, 874). We review the circuit court's findings of fact "under the clearly erroneous standard." *Peterson v. Issenhuth*, 2014 S.D. 1, ¶ 15, 842 N.W.2d 351, 355 (quoting *Eagle Ridge Estates Homeowners Ass'n, Inc. v. Anderson*, 2013 S.D. 21, ¶ 12, 827 N.W.2d 859, 864). We review the circuit court's conclusions of law de novo. *Id.*

[¶18.] Further, we review "a circuit court's decision to admit or deny an expert's testimony under the abuse of discretion standard." *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 12, 737 N.W.2d 397, 402. An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Thurman v. CUNA Mut. Ins. Soc'y*, 2013 S.D. 63, ¶ 11, 836 N.W.2d 611, 616.

### Analysis

[¶19.] **Whether the circuit court erred in striking Lillehaug's expert opinion, which was based upon a national standard of care.**

[¶20.] Hamilton contends that his expert's (Lillehaug's) testimony was reliable and any deficiency should go towards the weight, not admissibility, of his testimony. Appellees contend that Lillehaug based his testimony on an incorrect standard of care (national) and, thus, the circuit court appropriately excluded

Lillehaug's testimony. These arguments touch on the first two issues raised by Hamilton; therefore, we will address those issues together.

[¶21.] A negligence action in general requires four elements to be proven. As stated in *Bernie v. Catholic Diocese of Sioux Falls*, "[i]n order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury." 2012 S.D. 63, ¶ 15, 821 N.W.2d 232, 240 (quoting *Highmark Fed. Credit Union v. Hunter,* 2012 S.D. 37, ¶ 9, 814 N.W.2d 413, 415). Moreover, a successful claim against an attorney for legal malpractice requires proof of four elements: "(1) the existence of an attorney-client relationship giving rise to a duty, (2) the attorney, either by an act or failure to act, breached that duty, (3) the attorney's breach of duty proximately caused injury to the client, and (4) the client sustained actual damage." *Peterson*, 2014 S.D. 1, ¶ 17, 842 N.W.2d at 355.

[¶22.] "[T]he existence of a duty is a question of law to be determined by the court" and not the jury. *Janis v. Nash Finch Co.*, 2010 S.D. 27, ¶ 8, 780 N.W.2d 497, 500 (quoting *Small v. McKennan Hosp.*, 403 N.W.2d 410, 413 (S.D. 1987)). "The court determines, as a matter of law, the existence and scope or range of that duty." 57A Am. Jur. 2d Negligence § 78 (2014). Depending on the facts of the case, locality may or may not be one of the considerations of the court in determining duty as a matter of law. "In terms of legal malpractice, as in tort law generally, the standard of care is the behavioral component of duty." Michael P. Ambrosio & Denis F. McLaughlin, *The Use of Expert Witnesses in Establishing Liability in Legal Malpractice Cases*, 61 Temp. L. Rev. 1351, 1357-58 (1988). "Once the court

determines that the law imposes a duty[,] . . . it must then determine what conduct the law requires to fulfill that legal duty." *Id.*

> [T]he required standard of conduct is the exercise of professional care and skill. Although this general legal standard of care is established by law, the question of whether the legal standard of care has been fulfilled in a particular case is decided by the malpractice trier of fact. On this issue, the role of the expert witness is critical. Except in certain cases, it is an expert witness who must establish the particular standard of care, i.e., the particular level of professional conduct required to meet the legal standard of care, and whether an attorney's conduct conforms to this standard of care. This is because the degree of skill and care ordinarily exercised by lawyers in particular cases is generally beyond the common knowledge of laypersons.

*Id.* (footnotes omitted).

[¶23.] Consideration of the following criteria is required in determining the reasonableness of a lawyer's conduct: "(1) the requisite skill and knowledge; (2) the degree of skill and knowledge to be possessed and exercised; (3) the effect of local considerations and custom; and (4) any special abilities possessed by the lawyer." 2 Ronald E. Mallen & Jeffrey M. Smith, with Allison D. Rhodes, *Legal Malpractice* § 20:2 (2014 ed.). "A translation of these considerations into a standard of care means that *an attorney should exercise the skill and knowledge ordinarily possessed by attorneys under similar circumstances.*"[5] *Id.* "Considerations of locality, custom and special skills are treated as the 'similar circumstances.'" *Id.*

---

5. The duty of an attorney providing professional services has been articulated in various ways:

California: "The general rule with respect to the liability of an attorney for failure to properly perform his duties to his client is that the attorney, by accepting employment to give legal advice or to render other legal services, impliedly agrees to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the

(continued . . .)

performance of the tasks which they undertake." *Kirsch v. Duryea,* 578 P.2d 935, 938 (Cal. 1978) (quoting *Lucas v. Hamm,* 364 P.2d 685, 689 (Cal. 1961)).

Colorado: "An attorney owes his client a duty 'to employ that degree of knowledge, skill, and judgment ordinarily possessed by members of the legal profession in carrying out the services for his client.'" *Hopp & Flesch, LLC v. Backstreet,* 123 P.3d 1176, 1183 (Colo. 2005).

Iowa: An attorney breaches the duty of care owed to the client when the attorney fails to use "such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the task which [is undertaken]." *Martinson Mfg. Co. v. Seery,* 351 N.W.2d 772, 775 (Iowa 1984).

Minnesota: "Attorneys have a duty 'to exercise that degree of care and skill that is reasonable under the circumstances, considering the nature of the undertaking.'" *Jerry's Enters. Inc., v. Larkin, Hoffman, Daly & Lindgren, Ltd.,* 711 N.W.2d 811, 817 (Minn. 2006) (quoting *Prawer v. Essling,* 282 N.W.2d 493, 495 (Minn. 1979)).

Nebraska: "In a legal malpractice action, the required standard of conduct is that the attorney exercise such skill, diligence, and knowledge as that commonly possessed by attorneys acting in similar circumstances." *Young v. Govier & Milone,* 835 N.W.2d 684, 694 (Neb. 2013).

Two states adjacent to South Dakota apply a statewide standard:

North Dakota: An attorney providing professional services has a duty to perform those services with "that degree of skill, care, diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer in the practice of law in the State." *Wastvedt v. Vaaler*, 430 N.W.2d 561, 565 (N.D. 1988).

Wyoming: "To succeed on a legal malpractice claim, a plaintiff must establish each of the following: (1) the existence of a duty; (2) the accepted standard of legal care; (3) that the attorney departed from the accepted standard of care; and, (4) that the attorney's conduct was the legal cause of the injuries suffered. Ordinarily, the question of whether the fourth element, causation, has been shown will not arise unless the plaintiff has established each of the other three elements. To establish a departure from the standard of care, the plaintiff must show that the attorney failed to exercise the degree of care, skill, diligence and knowledge commonly possessed and exercised by a reasonable, careful and prudent lawyer in the practice of law in this jurisdiction." *Gayhart v. Goody*, 98 P.3d 164, 169 (Wyo. 2004) (citations omitted).

[¶24.]     Analyzing the facts in this case, in regard to the conflicted representation claim, we note that Lillehaug wrote in his expert report that "the applicable standard of care is consistent with, and well stated by, Rule 1.7." He noted how South Dakota's Rules of Professional Conduct Rule 1.7 is identical to the American Bar Association's Model Rules of Professional Conduct Rule 1.7. Then, during his deposition, Lillehaug testified that a national standard of care applied to legal ethics:

> **Lillehaug:** Okay. My opinion is that the standard of care with respect to conflict of interest, the issue relevant to us today, is essentially a national standard of care and that there is nothing unique about South Dakota in that regard. I believe I am familiar with the South Dakota standard of care with respect to conflict of interest, not just by reading the rule, but by discussions with South Dakota attorneys over the years, but I can't identify any particular attorneys or discussions.

> **Attorney:** So let me understand this . . . I asked: Are you familiar with the standard of care for legal ethics in South Dakota? And what you're saying to me is that you believe, as is relevant to this case, that it's a national standard of care and it's not a local standard of care; is that correct?

> **Lillehaug:** Correct.

[¶25.]     In regard to the insurance investigation claim, Lillehaug identified the standard of care as: "to take competent and diligent steps to identify and confirm liability coverage and tender the case to the carrier for defense and indemnity." Lillehaug testified his opinion was based on his experience and what he has learned

---

(. . . continued)

Restatement (Third) of The Law Governing Lawyers provides that "a lawyer who owes a duty of care must exercise the competence and diligence normally exercised by lawyers in similar circumstances." Restatement (Third) of The Law Governing Lawyers § 52 (2000).

from other more senior and experienced lawyers throughout the course of his career with respect to cases that involve insurance. He claimed that "other lawyers" included two members of the South Dakota Bar. Appellees' attorney asked:

> **Attorney:** Are you familiar with the standard practice regarding investigating insurance coverage in South Dakota by South Dakota lawyers?
>
> **Lillehaug:** I'm not aware that there is anything different with respect to South Dakota as far as investigating insurance coverage than in any other state.
>
> **Attorney:** Have you done any investigation to determine whether there is any standard of care different in South Dakota than what you have had?
>
> **Lillehaug:** No.

[¶26.] *Lenius v. King* is cited in the dissent as adopting the locality rule for defining the standard of care for attorneys in South Dakota. However, the issue that was appealed and decided in *Lenius* was the need for an expert on the standard of care. 294 N.W.2d 912, 913 (S.D. 1980). Although the circuit court in *Lenius* gave a jury instruction that included locality, that part of the instruction was not appealed and was thus not analyzed by the Court, other than to state, "[W]e are not persuaded that the instruction incorrectly states the law applicable in this case." *Id.* at 914. The Court went on to note that the circuit court applied the same standard of care required of a lawyer that is required for the medical profession. *Id.* We have since adopted a national standard of care for specialists in medicine. *See Mousseau v. Schwartz*, 2008 S.D. 86, ¶ 17, 756 N.W.2d 345, 352 (citing *Shamburger v. Behrens*, 418 N.W.2d 299, 306 (S.D. 1988), *overruled on other grounds by Russo v. Takata Corp.*, 2009 S.D. 83, 774 N.W.2d 441).

[¶27.] In describing a lawyer's duty, this Court in *Lenius* merely stated, in general:

> In a malpractice action the jury decides, from evidence presented at trial by other lawyers called as expert witnesses, *whether a lawyer possessed and used the knowledge, skill, and care which the law demands of him*. The opinions and testimony of such experts are indispensable in determining questions which are unfamiliar to ordinary witnesses and, within that field, the opinions of lay witnesses are not admissible.

294 N.W.2d at 914 (emphasis added).

[¶28.] In applying a standard of care, locality can also be considered as a factor or special circumstance when determining whether an attorney has met the standard, in an appropriate case, such as where local rules, practices or customs are relevant to claimed breach of duty.[6] However, in many cases locality is not relevant to the application of the standard of care.[7] Therefore, the application of the locality rule is fact specific and will not be an issue in every case. *See* Dwain E. Fagerlund, *Legal Malpractice: The Locality Rule and Other Limitations of the Standard of Care: Should Rural and Metropolitan Lawyers Be Held to the Same Standard of Care?*, 64 N.D. L. Rev. 661, 686-87 (1988). For the two issues in this case—first, conflict of

---

6. "Consideration of the locality, such as local rules, practices or customs, can determine the propriety of the attorney's conduct. If expert testimony is required locality considerations may limit the geographical area from which expert witnesses can be selected." Mallen et al., *supra* ¶ 23, § 20:5.

7. "The ability of the practitioner and the minimum knowledge required should not vary with geography. The rural practitioner should not be less careful, less able or less skillful than the urban attorney. The fact that a lower degree of care or less able practice may be prevalent in a particular local community should not dictate the standard of care." *Moore v. Lubnau,* 855 P.2d 1245, 1249 (Wyo. 1993) (quoting 1 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice,* § 15.5 (3d ed. 1989)).

interest in representing multiple clients and, second, investigation of insurance coverage—there was no showing that locality was a relevant factor.

[¶29.] In cases where locality may be relevant to the expectations a client has of his lawyer, we agree with the circuit court that a statewide focus would usually be appropriate. "[A]n attorney's required level of skill and ability is not defined by the individual locality in which he practices. The state is the more logical and generally accepted territorial limitation on the standard of care." *Moore v. Lubnau,* 855 P.2d 1245, 1249 (Wyo. 1993). However, there may be cases where it is not appropriate to apply a statewide standard, and we should not limit ourselves to only using a statewide approach.

> [T]here is the possibility that limiting the standard of care to the state may foster an unacceptably low level of performance in certain areas of the law. It is plausible that in some areas of law, all the lawyers in a given state may lack the necessary skill, knowledge, and experience to handle a case properly. If such were the case, testimony by a lawyer practicing in that state as to the standard of care in a similar situation would serve to perpetuate an unacceptably low level of legal service.

Fagerlund, *supra* ¶ 28, at 686-87.

[¶30.] Although it is now unlikely that David Lillehaug is in a position to testify in this case due to his current position on the Minnesota Supreme Court, he was, at the time his testimony was offered, highly qualified as an attorney to testify to the standard of care for attorneys. His expert testimony, when read in its entirety, addressed the issues of the requisite obligations of an attorney.[8] His

---

8. Lillehaug referenced the Model Rules of Professional Conduct. Although the Model Rules do not establish the standard of care for lawyers, a violation of a
(continued . . .)

testimony should not have been stricken because it failed to meet a locality standard, even when expanded by the circuit court to the statewide standard. Striking his testimony is illustrative of a glaring problem in applying the locality rule to all attorney malpractice actions, as there was no showing that locality unique to the jurisdiction had any impact on the standard of care in this case. His testimony met the requirements of SDCL 19-15-2, by assisting the trier of fact to understand a fact in issue. The striking of his testimony illustrates the trap in applying such a standard when locality is not relevant to attorneys' actions.

[¶31.] In determining the standard of care to be applied in this case, the circuit court on remand should evaluate the case under the standard that a lawyer, who owes a duty of care, must exercise the competence and diligence normally exercised by a lawyer in similar circumstances. If applicable, the court must consider locality, custom, and special skills in determining "similar circumstances." Mallen et al., *supra* ¶ 23, § 20:2. The court should specifically identify the "similar circumstances," if any, to be used by the jury in their determination whether the duty, as defined by the court, was breached.[9] *See id.* The trier of fact must apply

_____

(. . . continued)
Model Rule can be evidence of a breach of a civil standard of conduct. *See generally* Mallen et al., *supra* ¶ 23, § 20:7.

9.      As explained in Mallen et al., *supra* ¶ 23, § 20:2:

For example, when the only circumstance is that of a specialty, such as patent law, the standard could simply be described as "the skill and knowledge ordinarily possessed by lawyers engaged in the practice of patent law." In other words, the court in instructing the jury should, whenever possible, incorporate and specifically identify the similar circumstances that affect

(continued . . .)

that standard of care and address breach of duty, proximate and factual causation, and actual injury.

[¶32.] **Whether the circuit court erred in finding collateral estoppel precluded litigation on the conflicted representation issue.**

[¶33.] Hamilton argues that Judge Flemmer's finding, during the Underlying Lawsuit, that Hamilton signed a conflict of interest waiver at the outset of Appellees' representation was clearly erroneous, and that the circuit court was incorrect when it determined collateral estoppel precluded relitigation of that issue. Appellees argue that this issue is moot, or in the alternative, that the circuit court was correct when it determined collateral estoppel precluded relitigation of that issue.

[¶34.] The collateral estoppel doctrine "bar[s] relitigation of an essential fact or issue involved in the earlier suit" if a four-part test is satisfied: "(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question?  (2) Was there a final judgment on the merits?  (3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?  (4) Did the party against whom the plea is asserted have a full and fair opportunity to litigate the issue in the prior adjudication?" *Estes v. Millea*, 464 N.W.2d 616, 618 (S.D. 1990).  We review a circuit court's application of collateral

_____

(. . . continued)

the standard of care.  When the "circumstances" are complicated or lengthy, for clarity it may be desirable to identify each operative circumstance in a separate instruction.

estoppel de novo. *Am. Family Ins. Grp. v. Robnik*, 2010 S.D. 69, ¶ 14, 787 N.W.2d 768, 774.

[¶35.] In the Underlying Lawsuit after a formal hearing, Judge Flemmer found that Hamilton signed a conflict waiver at the outset of Appellees' representation. That finding was not objected to nor appealed. Applying the four-part collateral estoppel test, the circuit court found: "(1) the issue was decided by Judge Flemmer in a former adjudication; (2) Judge Flemmer entered a final judgment on the merits; (3) Hamilton previously litigated the issue and lost on the merits against Adee; (4) Hamilton had a full and fair opportunity to litigate the issue of conflicted representation in the prior adjudication." Ultimately, based on collateral estoppel, the court determined "the finding that a conflict of [interest] waiver was signed appears settled."

[¶36.] We agree that collateral estoppel applies to the limited issue of whether Hamilton had signed a conflict of interest waiver. *See Estes*, 464 N.W.2d at 618 (barring "relitigation of an essential fact or issue involved in the earlier suit"). Collateral estoppel does not apply to the broader question of whether Appellees engaged in a nonconsentable, conflicted representation of Hamilton.

[¶37.] **Whether the circuit court improperly weighed evidence in granting summary judgment regarding proximate cause.**

[¶38.] In addition to basing summary judgment regarding conflicted representation on Hamilton's failure to present expert testimony as to the appropriate standard of care, the circuit court relied on Hamilton's purported failure to bear his burden of production regarding proximate cause.

[¶39.]        Proximate cause is an essential element of a legal malpractice claim. *Peterson*, 2014 S.D. 1, ¶ 17, 842 N.W.2d at 355-56 (citing *Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 24, 652 N.W.2d 756, 767). Likewise, proximate cause is an essential element of a breach of fiduciary duty claim. *Chem-Age Indus., Inc.*, 2002 S.D. 122, ¶ 38, 652 N.W.2d at 772. Proximate cause is defined as "a cause that produces a result in a natural and probable sequence and without which the result would not have occurred. Such cause need not be the only cause of a result. It may act in combination with other causes to produce a result." *Peterson*, 2014 S.D. 1, ¶ 17, 842 N.W.2d at 355-56 (quoting *Estate of Gaspar v. Vogt, Brown & Merry*, 2003 S.D. 126, ¶ 6, 670 N.W.2d 918, 921). This Court has further defined proximate cause as "[a]n immediate cause and which, in natural or probable sequence, produced the injury complained of. . . . Furthermore, for proximate cause to exist, the harm suffered must be found to be a foreseeable consequence of the act complained of." *Weiss v. Van Norman*, 1997 S.D. 40, ¶ 13, 562 N.W.2d 113, 116-17 (quoting *Musch v. H-D Coop., Inc.*, 487 N.W.2d 623, 624 (S.D. 1992)). "Causation is generally a question of fact for the jury except when there can be no difference of opinion in the interpretation of the facts." *Id.* Further, this Court has worded the attorney malpractice causal requirement in the negative:

> [I]t is often said that the plaintiff can recover against the defendant-attorney only when it can be shown that the injury would not have occurred "but for" the negligence of the lawyer. Thus, the plaintiff must establish that the total or partial loss would not have occurred had it not been for some act or omission on the part of the attorney.

*Id.* ¶ 12 (quoting *Haberer v. Rice*, 511 N.W.2d 279, 284 (S.D. 1994)). The plaintiff can satisfy the causation element by recreating the underlying action—known as a "case within a case." *Haberer*, 511 N.W.2d at 285.

[¶40.] Specifically, Hamilton argues he provided sufficient proximate cause evidence based on whether he would have been successful in the Underlying Lawsuit. He argues the following facts for support:

> (1) Adee received a much better result through settlement than he would have at trial because he did not request any bee sites in the underlying matter; (2) Hamilton won at the administrative hearing based on the landowners having the right to decide who placed hives on their land; (3) Hamilton's damages are based on the loss of bee yards and [Appellees] cannot claim this is speculative because it is the same theory they used to argue Adee would obtain a large jury verdict; (4) Sommers told Hamilton he had done nothing wrong and that Adee could provide no fact on which a jury could find against him; (5) Block and Amman testified in their depositions that Hamilton did nothing wrong; (6) there was no interest in settlement until after the motion hearing; and (7) there was no evidence that Hamilton misrepresented facts or that he aided in misrepresentations made by Amman and Block.

Appellees argue that no reasonable jury could have found that Hamilton would have received a better result in the Underlying Lawsuit but for Appellees' alleged negligence.

[¶41.] Here, the circuit court found that Hamilton would not have prevailed in the Underlying Lawsuit, citing evidence to support a civil conspiracy claim against Hamilton, including joint participation in preparing the revocation and permission form, printing the listing sites, dividing respective territories by geographic region, establishing a territorial boundary line in obtaining sites "sold" to Adee, and traveling to Pierre to register the sites. The court stated there was

evidence that Hamilton went to sites where he knew Adee had been, including where he actually saw Adee's hives, and received permission from the owner to place bee hives at that site.

[¶42.] Hamilton argues that the circuit court improperly weighed that evidence. Upon review, we agree. The evidence mentioned by the court raises genuine questions of material fact. The circuit court conceded: "Thus, Hamilton raises a question of fact as to whether he participated with Block and Amman in the alleged conspiracy." The circuit court then went on to weigh evidence and resolve disputed evidence to conclude that Hamilton participated in the alleged conspiracy and, therefore, would not have prevailed in the Underlying Lawsuit. The judge's function at the summary judgment stage, however, is not to weigh the evidence and determine the matters' truth. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). But, it appears that is what the court did here. Weighing the evidence to derive its conclusion that Hamilton would not have prevailed in the Underlying Lawsuit was reversible error.

[¶43.] Alternatively, Hamilton argues he provided sufficient proximate cause evidence to show that the Underlying Lawsuit's settlement was unreasonable. Appellees argue that the settlement was reasonable.

[¶44.] When reviewing a settlement's reasonableness, we are aware of a lawyer's hindsight vulnerability. Settlement negotiations often require flexible and educated positions, by both parties, in arriving at an agreeable solution. That flexibility requires a flexible standard of care. A California appellate court aptly stated that "[t]he standard should be whether the settlement is within the realm of

-21-

reasonable conclusions, not whether the client could have received more or paid less." *Filbin v. Fitzgerald*, 149 Cal. Rptr. 3d 422, 433 (Cal. Ct. App. 2012) (internal quotation marks omitted). The court justified: "No lawyer has the ability to obtain for each client the best possible compromise but only a reasonable one." *Id.* (internal quotation marks omitted).

[¶45.] The circuit court determined that Hamilton provided insufficient evidence that Appellees' settlement was unreasonable, what would have been a reasonable settlement, and that Adee would have agreed to the settlement. *See Stern Oil Co. v. Brown*, 2012 S.D. 56, ¶ 8, 817 N.W.2d 395, 398 ("[T]he party challenging summary judgment must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." (quoting *Tolle v. Lev*, 2011 S.D. 65, ¶ 11, 804 N.W.2d 440, 444)). In his brief, Hamilton does not seem to dispute those findings. Instead, Hamilton argues he never should have been put in the position to settle. It is premature, however, to address this matter, as a remand may or may not substantiate Hamilton's claim.

[¶46.] Hamilton also argues Appellees' failure to investigate insurance coverage was the proximate cause of Hamilton's damage. Appellees argue that Hamilton provided insufficient evidence to support his claim.

[¶47.] On review, we note that the circuit court did not address this exact issue in its memorandum decision or order. In its order, the court based its decision to grant summary judgment on the insurance investigation claim on Hamilton's failure to provide sufficient expert testimony, not on a failure to provide sufficient

evidence to support a finding of proximate cause. As no finding or conclusion was based on this argument, we do not address it.

[¶48.] **Whether the circuit court committed reversible error by denying a continuance after striking Lillehaug's testimony.**

[¶49.] Because of our ruling on the preceding issues, we need not reach this issue.

## Conclusion

[¶50.] The circuit court did not err by finding collateral estoppel precluded litigation of the limited issue of whether Hamilton signed a conflict of interest waiver. However, the circuit court abused its discretion by striking Hamilton's expert's opinion, leaving Hamilton without the necessary expert opinion to establish the applicable standard of care. In addition, the circuit court inappropriately weighed evidence during summary judgment in its proximate cause determination on the conflicted representation issue. As a result, summary judgment was improper. We affirm in part, reverse in part, and remand consistent with this opinion.

[¶51.] KONENKAMP, ZINTER and SEVERSON, Justices, concur.

[¶52.] GILBERTSON, Chief Justice, dissents.


GILBERTSON, Chief Justice (dissenting).

[¶53.] *Lenius v. King*, 294 N.W.2d 912 (S.D. 1980), and other cases establish that South Dakota follows the locality rule in determining whether an attorney's conduct breaches the standard of care, which results in legal malpractice. I conclude that especially in this case, retention of the locality rule is the correct

-23-

approach, rather than adopting a state or national standard. Because I am not convinced that the circuit court abused its discretion in striking Lillehaug's testimony, and because I conclude that Hamilton failed to properly make a motion for continuance, the circuit court's decision to grant summary judgment in favor of Sommers should be affirmed.

[¶54.]       *1.*     *Justification for adherence to the locality rule.*

[¶55.]       The Court limits the support *Lenius* provides for the application of the locality rule in South Dakota. The Court states that "[a]lthough the trial court in *Lenius* gave a jury instruction that included locality, that part of the instruction was not appealed and was thus not analyzed by the Court[.]" Instead, the Court concludes that the issue decided in *Lenius* was merely whether an expert was required to testify as to an attorney's standard of care. However, despite distinguishing our (passive) endorsement of the locality rule in *Lenius*, the Court recognizes that we there stated, "The trial court applied the same standard of care required of a lawyer that is settled for the medical profession." *Lenius*, 294 N.W.2d at 914. At the time, the standard that applied to the medical profession was the locality rule.[10] *See id.* (citing *Hansen v. Isaak*, 70 S.D. 529, 531, 19 N.W.2d 521, 522

---

10.     As the Court points out, we subsequently adopted a "national standard of care for specialists in medicine." *Shamburger v. Behrens*, 418 N.W.2d 299, 306 (S.D. 1988), *overruled on other grounds by Russo v. Takata Corp.*, 2009 S.D. 83, 774 N.W.2d 441. In the year following *Shamburger*, however, we confirmed that the standard for non-medical professionals retained consideration of locality. *Matter of Yemmanur*, 447 N.W.2d 525, 529 (S.D. 1989). The reason for this is simple: the knowledge and procedure required to perform an appendectomy, for example, is largely the same regardless of whether the doctor performing the operation is located in South Dakota, North Dakota, Minnesota, or Indian Country. In comparison, an attorney

(continued . . .)

#26720

(1945) ("The law requires that a physician shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in the same community . . . ."). We have also said that "[i]n professional negligence actions one must generally consider the locality of practice in determining the standard of care for professionals." *Matter of Yemmanur*, 447 N.W.2d 525, 529 (S.D. 1989). In *People ex rel. M.H.*, we actually expanded the concept of a locality rule to require that an "expert witness" in an Indian Child Welfare Act case be an expert on the child's tribe and not just on Native American culture in general. 2005 S.D. 4, ¶ 12, 691 N.W.2d 622, 626.

[¶56.] Although other policy considerations may have necessitated the creation of the locality rule, our continued adherence to it is prescribed by the same evidentiary concerns underlying the fundamental qualifications for the admissibility of any expert testimony: the testimony must be reliable and relevant. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176, 143 L. Ed. 2d 238 (1999); *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 25, 737 N.W.2d 397, 406 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993)). These two evidentiary concerns are embodied in SDCL 19-15-2 (Rule 702), which governs the admissibility of expert testimony. It reads, in pertinent part:

> If . . . specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

---

(. . . continued)

representing an apiarist in Roberts County might be expected to understand and apply the law and procedure of upwards of five distinct bodies of law.

-25-

> training, or education, may testify thereto in the form of an opinion or otherwise, if: (1) The testimony is based upon sufficient facts or data, (2) The testimony is the product of reliable principles and methods, and (3) The witness has applied the principles and methods reliably to the facts of the case.

*Id.* As a rule of exclusion that restricts who may qualify as an expert witness, *see* 2 Ronald E. Mallen & Jeffrey M. Smith, with Allison D. Rhodes, *Legal Malpractice* § 20:5 (2014 ed.) ("If expert testimony is required locality considerations may limit the geographical area from which expert witnesses can be selected."), the locality rule is now, in essence, a manifestation of Rule 702.

[¶57.]     As a manifestation of Rule 702, the locality rule is relevant whenever a party proffers an expert witness, contrary to the Court's conclusion that "in many cases locality is not relevant to the application of the standard of care."  While I agree that a witness's geographic location may not always be relevant,[11] a potential witness's knowledge of the legal peculiarities of a particular geographic area certainly is relevant in *every* case.  The absence of such peculiarities does not change the relevance of the locality rule in any way.  The rule should not be read to apply only when local conditions create a legal landscape that differs from a state or national standard.  Rather, when the local standard is coextensive with the

---

11.    The circuit court quite correctly pointed out that "the locality concept is not concerned with where the expert lives, but is concerned with the locality he or she is opining about[]" and that "[t]he expert testifying as to the standard of care does not have to be from South Dakota provided that the person has the ability to opine what the South Dakota standard is."  Modern communications and the general availability of information offers the opportunity for practically any attorney to become an expert regarding a particular locale, even if that attorney does not practice in that geographic area.

applicable state or national standard, the result under the locality rule is, not surprisingly, the same as the result under the state or national standard. Furthermore, if circumstances are such that the local standard is obviously coextensive with that of the state or nation, as the case may be, the circuit court has discretion to "avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *See Kumho*, 526 U.S. at 152, 119 S. Ct. at 1176. In other words, even though the locality rule is always relevant, the circuit court maintains its usual control and discretion over the admissibility of expert testimony.

[¶58.] As a product of the expert qualification requirements embodied in Rule 702 and *Daubert*, the locality rule is not only relevant, it is a *necessary* consideration whenever a party proffers an expert witness. *See State v. Guthrie*, 2001 S.D. 61, ¶ 32, 627 N.W.2d 401, 415 ("Before admitting expert testimony, the court must address [reliability and relevance]."). "The objective of [this gatekeeping requirement] . . . is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152, 119 S. Ct. at 1176. If a proffered expert lacks knowledge of the unique conditions of a particular geographic area, he or she cannot be qualified as an expert under SDCL 19-15-2 (Rule 702). Thus, application of the locality rule in the qualification process prevents a party from qualifying an expert

under a homogenized state or national standard and then having that expert testify on purely local matters that lie outside the witness's "knowledge, skill, experience, training, or education[.]" *See* SDCL 19-15-2 (Rule 702). After all, "[t]he value of the opinion of an expert witness is no better than the facts upon which it is based. It cannot rise above its foundation and proves nothing if its factual basis is not true. It may prove little if only partially true." *Bridge v. Karl's, Inc.*, 538 N.W.2d 521, 525 (S.D. 1995). *See also People ex rel. M.H.*, 2005 S.D. 4, ¶ 15, 691 N.W.2d at 627.

[¶59.] The Court's proposal reverses the expert qualification process. The Court suggests that the circuit court must "consider locality, custom, and special skills in determining 'similar circumstances.' The court should specifically identify the 'similar circumstances,' if any, to be used by the jury . . . . The trier of fact must apply that standard of care and address breach of duty, proximate and factual causation, and actual injury." While local conditions function as a filter for qualifying an expert in a *Daubert* hearing under the locality rule, those same conditions would merely serve to define the jury instructions under the Court's decision today. There are several problems with this approach.

[¶60.] First, such an approach tasks the jury with the burden of applying negligence principles without the benefit of expert guidance. In *Lenius* we approvingly quoted the Georgia Court of Appeals' summary of the expert rule as it applies to the legal profession.

> [E]xcept in clear and palpable cases . . . , expert testimony is necessary to establish the parameters of acceptable professional conduct, a significant deviation from which would constitute malpractice. The reason for this requirement is simply that a jury cannot rationally apply negligence principles to professional conduct absent evidence of what the competent lawyer would

have done under similar circumstances, and the jury may not be permitted to speculate about what the "professional custom" may be. Expert evidence as to the "professional custom" is required in malpractice actions against other professionals.

294 N.W.2d at 914 (quoting *Hughes v. Malone*, 247 S.E.2d 107, 111 (Ga. Ct. App. 1978)). The situation described by the Georgia Court of Appeals is exactly the situation in which this Court will place the juries of this State. By removing the consideration of local legal conditions from the expert qualification process, the Court's approach necessarily opens the door for a witness to be qualified as an "expert"—perhaps lacking even a minimum quantum of knowledge about local conditions—and to subsequently testify and offer opinion as to whether an attorney's actions conform to a state or national standard of care. If the circuit court dutifully applies this Court's instructions and includes some of those local conditions in instructing the jury as to the standard of care, then in the best case scenario, the jury will functionally be placed in the situation of applying negligence principles to professional conduct without the benefit of expert guidance. In the worst case, the jury might actually be led astray by ignorant testimony draped in the cloak of authority. Either outcome is contrary to *Daubert* and to the axiom that "[t]he fundamental test for admission of expert testimony . . . is whether it will *assist* the jury in resolving the factual issues before it." *See State v. Corey*, 2001 S.D. 53, ¶ 15, 624 N.W.2d 841, 845 (emphasis added). *See also Daubert*, 509 U.S. at 591-92, 113 S. Ct. at 2796 ("Rule 702's 'helpfulness' standard requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility.").

[¶61.] Second, the Court's proposed treatment of local conditions—to require a showing from the party seeking the benefit of those circumstances and *possible*

inclusion in the jury instructions—does not provide a functional rule upon which a practicing attorney can rely. To further complicate matters, the Court suggests that "there may be cases where it is not appropriate to apply a statewide standard, and we should not limit ourselves to only using a statewide approach." Apparently, this means we will sometimes apply a national standard instead of a state standard. Under the locality rule, an attorney is always put on notice that he or she will be charged with performing in a manner consistent with a duty of care that incorporates the legal landscape in which he or she practices. Under the Court's approach, on the other hand, an attorney must wait to find out whether he or she must comply with a local, state, or national standard until the jury instruction stage—well after any violative conduct has occurred.

[¶62.] Third, the Court's proposed abandonment of the locality rule could significantly alter the standard under which we review a circuit court's treatment of local legal circumstances. "Trial courts retain broad discretion in ruling on the admissibility of expert opinion. Decisions to admit or deny opinion evidence will not be reversed absent a clear showing of abuse of discretion." *Guthrie*, 2001 S.D. 61, ¶ 30, 627 N.W.2d at 414-15 (citations omitted). On the other hand, "no court has discretion to give incorrect, misleading, conflicting, or confusing instructions[.]" *Vetter v. Cam Wal Elec. Coop., Inc.*, 711 N.W.2d 612, 615 (S.D. 2006). Consequently, while we "generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard[,] . . . when the question is whether a jury was properly instructed overall, that issue becomes a question of law reviewable de novo." *Vetter*, 711 N.W.2d at 615. Thus, relegating

the consideration of local conditions to the jury instruction stage not only increases the likelihood that a witness will be allowed to offer expert testimony on a subject in which he or she lacks expertise—in violation of Rule 702 and *Daubert*—it will also tend to limit a circuit court's power over what has traditionally been a matter of judicial discretion by eroding the deference with which we review those decisions.

[¶63.] In exchange for the concerns outlined above, the Court's suggested approach offers no potential gain over continued adherence to the locality rule. There is no difficulty in applying the locality rule to cases that do not involve local legal idiosyncrasies—in such a case the local standard *is* the state standard. Further, when considered as a manifestation of a court's duty to ensure the reliability and relevance of expert testimony, the locality rule will not frequently deviate from this state standard. Thus, as the Court noted, a "statewide focus would usually be appropriate." This is true, however, not because we decline to apply the locality rule in some situations; rather, it is a natural state resulting from local standards that tend to be coextensive with the prevailing standard across the State.[12] When viewing the locality rule as a component of the expert qualification

---

12. The circuit court anticipated that we would expand the locality rule to encompass the entire state. It based its prediction, in part, on the conclusion that "[p]assing the South Dakota Bar Examination indicates that the standard of care should be statewide and not localized to smaller communities." However, we have previously said that "[t]he standards used for determining negligence and competence are separate and distinct." *Yemmanur*, 447 N.W.2d at 529. While requiring an individual to pass a state bar examination as a prerequisite to practicing in this state may be indicative of a state *competency* standard, it has no bearing on a tort negligence standard of care. *Cf. id.* ("[W]e believe it is clear that this minimum degree of skill and knowledge required to practice medicine in this state represents the state-wide standard of competence . . . .").

process, the circuit court maintains its usual control and discretion over the admissibility of expert testimony. If a particular locale does not have any unique legal conditions, then the result of applying the locality rule is the same as if it had not been applied at all. In short, we need not completely abandon the locality rule to achieve the Court's desired goals.

[¶64.]    The Court's decision today to remove the consideration of locality from the expert witness qualification process is unnecessary and limits a circuit court's ability to ensure that expert witnesses do, in fact, possess heightened expertise on whatever issue they are called upon to explain. Simply declaring that we apply a state or national standard does not actually remove the local legal peculiarities that attorneys in this state must handle on a daily basis. For the above reasons I would retain the locality rule.

[¶65.]    2.    *Application of the locality rule to this case.*

[¶66.]    This is a case about bees. Specifically, it is a case about the State of South Dakota's regulation of the bee industry. According to the record, beekeepers generally pay landowners for the right to place bee hives on their land in South Dakota. The landowner usually gets compensation for this grant either in the form of cash or honey. The permission by the landowner must be registered with the South Dakota Department of Agriculture. *See generally* SDCL 38-18.

[¶67.]    As this case is venued in Roberts County, the legal issues to which an attorney must apply reasonable knowledge, skill, and care are tied not only to the South Dakota statutes concerning bees, but also to the legal landscape of that particular locale. The rights and responsibilities of an apiarist maintaining hives in an area, as well as the value of any given bee site, are directly influenced by the

scope of the State's jurisdiction to regulate bee operations in that specific area. An attorney advising his client in a factual situation such as this would have to have knowledge of the State's regulatory authority in Roberts County and adjoining areas.

[¶68.] Roberts County has legally established boundaries. *See* SDCL 7-1-55. On the northern boundary is the State of North Dakota. On the eastern boundary is the State of Minnesota. However, between Roberts County and Minnesota are two interstate lakes—Lake Traverse and Lake Big Stone—which are subject to at least some Federal control. *See North Dakota* v. *Minnesota*, 263 U.S. 365, 376, 44 S. Ct. 138, 140, 68 L. Ed. 342 (1923). Moreover, 15% of the land located within Roberts County is within the status of "Indian Country," *see* 18 U.S.C. § 1151, in the form of trust allotments. *DeCoteau v. Dist. Cnty. Ct.*, 420 U.S. 425, 428, 95 S. Ct. 1082, 1085 43 L. Ed. 2d 300 (1975); *see also United States v. Rickert*, 188 U.S. 432, 23 S. Ct. 478, 47 L. Ed. 532 (1903) (addressing authority of Roberts County to impose various taxes on lands "held by any Indian or Indian tribe"). Other areas of Roberts County contain "dependent Indian communities" that, under 18 U.S.C. § 1151, are also subject to tribal and Federal control. *DeCoteau*, 420 U.S. at 428, 95 S. Ct. at 1085; *see also United States v. South Dakota*, 665 F.2d 837 (8th Cir. 1981). In addition, the Sisseton-Wahpeton Sioux Tribe has its own constitution, codes, and court system. *DeCoteau*, 420 U.S. at 464-67, 95 S. Ct. at 1102-04 (Douglas, J., dissenting); Frank Pommersheim, *South Dakota Tribal Court Handbook* 35-39 (1988).

[¶69.]     As the bee goes about its daily business, it is oblivious to whether it has crossed a state line, is flying over interstate waters, or is now enjoying the vegetation of Indian Country.  However, an attorney advising clients like those involved in this litigation would have to have a working knowledge of the legal rights granted to a bee keeper by SDCL 38-18, and must understand the reach of those rights in this geographical area.  We held in *Staab v. Cameron*, 351 N.W.2d 463, 466 (S.D. 1984), that an attorney is only liable for malpractice for losses actually sustained as a proximate result of the conduct of the attorney.  Although the expert witness for the Plaintiff, here, is a highly qualified attorney in the Minneapolis area, he admits he has no such knowledge of the legal status of various tracts in Roberts County.  He said he did consult attorneys in Yankton and Rapid City, both hundreds of miles away from the Roberts County locale.  There is no showing in the record that these attorneys, who are undoubtedly highly competent, possess the professional knowledge that it would take to navigate this legal minefield.  This, it seems to me, is the weakness in adopting a state standard rather than retaining our locality rule.

[¶70.]     Hamilton argues that the application of the locality rule will prevent plaintiffs from finding attorneys willing to testify as experts for a plaintiff.  If accurate, it would be expected that an appeal addressing application of the locality rule in this state would have occurred in the last 34 years since *Lenius* was decided.  In addition to *Lenius*, there have been several legal malpractice cases in which the plaintiff found an expert.  *See, e.g.*, *Behrens v. Wedmore*, 2005 S.D. 79, 698 N.W.2d

555; *Estate of Gaspar v. Vogt, Brown & Merry*, 2003 S.D. 126, 670 N.W.2d 918;

*Dakota Cheese v. Ford*, 1999 S.D. 147, 603 N.W.2d 73.

[¶71.]     Retention of the locality rule is not a method to allow attorneys in

rural settings to "get away" with more, or otherwise have a more lax standard of

care. Given a legal and factual background such as in this case, the locality rule

may instead serve to heighten the standard compared to a state standard of care.

> Unlike the medical field, however, [an attorney's] knowledge of
> local practices, rules, or customs may be determinative of, and
> essential to, the exercise of adequate skill and knowledge. An
> attorney must know local statutes, ordinances or rules.
> Frequently, trial attorneys place great weight on the cultural,
> economic or social characteristics of the community in which the
> matter is to be tried.

Mallen et al., *supra* ¶ 56, § 20:5. An attorney's knowledge of the local jury, judges,

and cultural issues all affect whether the attorney exercised the reasonable

standard of care. *Id.* The entirety of the legal and factual landscape of the locality

dictates what actions are professionally reasonable. In Roberts County and other

locations across South Dakota, an attorney may need to exhibit different knowledge

or take additional or greater precautions, given what a reasonable attorney should

know about the unique jurisdictional, legal, geographical, cultural, and practical

considerations of that area.

[¶72.]     The circuit court determined that "[c]ertainly Lillehaug could acquaint

himself with the South Dakota standard of care; it just did not occur in this

situation." Because nothing in the record indicates that the circuit court abused its

discretion in determining that Lillehaug was not qualified to testify as to the

appropriate standard of care in South Dakota—let alone Roberts County—I see no reason to reverse its decision on this issue.

[¶73.]        3.        *Hamilton's failure to properly move for continuance.*

[¶74.]        Because of its decision on the locality rule, the Court does not address whether the circuit court should have granted Hamilton a continuance. Hamilton claims that he "promptly raised the issue of a continuance at summary judgment and in a post-hearing motion for hearing on setting trial date and notice of newly discovered evidence." Thus, he concludes that "the circuit court committed reversible error by failing to give Hamilton the opportunity to obtain a replacement expert witness." However, while Hamilton may have mentioned the issue of continuance, the record does not reflect—and he does not seem to claim—that he ever actually moved the circuit court for continuance. Unfortunately for Hamilton, the South Dakota Legislature has outlined specific requirements for requesting continuance.

> All applications for continuance must be made, *by motion . . . .*
> All such motions shall be *in writing and accompanied by affidavits* in support of the motion, which affidavits shall set forth *with particularity* the grounds and cause for such motion as well as the efforts of the party or the party's attorney to avoid such delay.

SDCL 15-11-6 (emphasis added). Even if we were to conclude that the one sentence contained in Hamilton's Motion for Hearing On Setting Trial Date dedicated to requesting permission to obtain a second expert served as a de facto motion for continuance—I am convinced it does not—Hamilton clearly failed to submit the required affidavits in support of that motion.

-36-

[¶75.]     Perhaps a continuance would have been appropriate in this case, considering that at the time the circuit court struck Lillehaug's testimony, no trial date had yet been determined.[13]  *See Tosh v. Schwab*, 2007 S.D. 132, ¶ 26, 743 N.W.2d 422, 430 ("[T]here would have been no delay or prejudice . . . because the trial date had not yet been scheduled.").  On the other hand, the locality rule has remained undisturbed for decades, including all times relevant to this litigation, regardless of the Court's decision today.  Perhaps failing to secure an expert on the legal landscape of Roberts County was simply bad planning on Hamilton's part—a factor that would militate against granting a continuance.  *Id.* ¶ 25, 743 N.W.2d at 430 (quoting *State v. Moeller*, 2000 S.D. 122, ¶ 8, 616 N.W.2d 424, 431).  We have nothing to review, however, because Hamilton's counsel did not properly move for continuance and, consequently, the circuit court made no decision regarding the same.  It is ironic that Hamilton's counsel—in an action against other attorneys based, in part, on their failure to make a motion for continuance—themselves failed to properly file a motion for continuance.

[¶76.]     Expert testimony was necessary in this case.  *See Lenius*, 294 N.W.2d at 914 (quoting *Hughes*, 247 S.E.2d at 111).[14]  The circuit court determined that Lillehaug had not familiarized himself with Roberts County prior to testifying and,

---

13.    The circuit court originally set a trial date of April 16, 2013.  However, the court cancelled that date after learning of Lillehaug's possible appointment to the Minnesota Supreme Court.  At the time the circuit court struck Lillehaug's testimony, it had not set a new trial date.

14.    In its memorandum opinion, the circuit court noted the parties also agreed that expert testimony was necessary to establish the standard of care.

consequently, struck his testimony. I am not convinced that the court abused its discretion in reaching this conclusion. Without an expert to testify as to the standard of care, summary judgment was appropriate and Hamilton's remaining issues are moot.[15] Therefore, I dissent.

---

15. Hamilton was required to prove "(1) the existence of an attorney-client relationship giving rise to a duty; (2) the attorney, either by an act or failure to act, breached that duty; (3) the attorney's breach of duty proximately caused injury to the client; *and* (4) the client sustained actual damage." *Peterson v. Issenhuth*, 2014 S.D. 1, ¶ 17, 842 N.W.2d 351, 355 (emphasis added) (quoting *Chem-Age Indus., Inc. v. Glover*, 2002 S.D. 122, ¶ 24, 652 N.W.2d 756, 767) (internal quotation marks omitted). Because proof of all four elements is required to establish a malpractice claim, a necessary failing of any one element—such as the failure to produce an expert to articulate the applicable standard of care—alone renders the claim legally insufficient. Therefore, I would not reach the issue of proximate cause.