#30463-a-MES
**2024 S.D. 53**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ACUITY, A MUTUAL INSURANCE
COMPANY,                                    Plaintiff and Appellee,

     v.

A MAXON COMPANY, LLC,                    Defendant,

     and

GREG AND TAMMY WEATHERSPOON,     Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
CORSON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE GORDON SWANSON
Retired Judge

\* \* \* \*

NATHAN R. CHICOINE of
DeMersseman, Jensen, Tellinghuisen
     & Huffman, LLP
Rapid City, South Dakota                    Attorneys for defendants and
                                            appellants.


MARK J. ARNDT
TYLER A BRADLEY of
Evans, Haigh & Arndt, LLP
Sioux Falls, South Dakota                    Attorneys for plaintiff and
                                            appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
APRIL 23, 2024
OPINION FILED **09/04/24**

#30463

SALTER, Justice

[¶1.]       Following a fire that damaged a malt beverage store owned by A Maxon Company, LLC (AMC), Acuity Insurance Company brought a declaratory judgment action to determine a question of coverage under the terms of an insurance policy, which listed Greg and Tammy Weatherspoon as additional loss payees.  In a counterclaim, the Weatherspoons alleged a breach of contract.  At trial, the circuit court granted Acuity's motion for judgment as a matter of law with respect to the Weatherspoons' counterclaim based upon the court's determination that the terms of the insurance policy prevented the Weatherspoons from recovering damages unless AMC successfully asserted a claim for coverage.  The jury ultimately determined that AMC principal, Russel Maxon, had intentionally started the fire, which, in turn, meant that coverage was excluded under AMC's policy.  The Weatherspoons appeal, challenging the court's decision to grant the motion for judgment as a matter of law as well as two evidentiary rulings made during trial. We affirm.

## Factual and Procedural Background

[¶2.]       The Weatherspoons originally owned and operated T-Spoons, a malt beverage store in McLaughlin.  In July 2017, they entered into a contract for deed to sell T-Spoons to Russel and Tracy Maxon.  The Maxons purchased the property through their company, AMC, and began operating T-Spoons.  Pursuant to the contract for deed, the Maxons were required to insure the property and list the Weatherspoons as loss payees.  AMC purchased property coverage under a commercial general liability insurance policy issued by Acuity in August 2017.

-1-

[¶3.]     The insurance contract contained a "Loss Payable Clauses" endorsement that governed Acuity's obligation to pay listed loss payees who were not insureds, like the Weatherspoons, in the event of a loss. The Loss Payable Clauses endorsement delineated four individual clauses that addressed specific loss payable situations: 1) the Loss Payable Clause, 2) the Lender's Loss Payable Clause, 3) the Contract of Sale Clause, and 4) the Building Owner Loss Payable Clause. Also included was a schedule that listed the Weatherspoons as loss payees and designated their "applicable clause" as the "Loss Payable" clause, the first of the four individual clauses listed in the Loss Payable Clauses endorsement.

[¶4.]     On April 15, 2018, the T-Spoons building was damaged by a fire that originated in the basement. Acuity hired Chris Rallis to investigate the fire. Rallis concluded that the fire was intentionally set and believed Russel had started it because Russel was the only person who had access to the building immediately prior to the fire. Rallis reasoned, though not noted in his investigation report, that Russel had a motive to start the fire because AMC was struggling financially. Beer distributors had stopped delivering to T-Spoons because the Maxons had written bad checks, and Russel had supplied T-Spoons with inventory by purchasing beer from a retail source. Special Agent Derek Hill of the Bureau of Alcohol, Tobacco, and Firearms (ATF) also conducted an investigation and determined the fire was intentionally started by Russel.

[¶5.]     Following the fire, the Weatherspoons filed a proof of loss with Acuity in an effort to claim damages relating to the T-Spoons fire. However, Acuity denied the claim, reasoning that the Weatherspoons' ability to collect, as loss payees, was

dependent on whether AMC could make a compensable claim. AMC had not made a claim initially, though it later made a claim on July 31, 2020, over two years after the fire.

[¶6.] After Acuity denied the Weatherspoons' claim, it commenced this declaratory judgment action in December 2018, naming the Weatherspoons and AMC as defendants. The Weatherspoons filed an answer and counterclaim alleging that Acuity breached the insurance contract by not paying damages to the Weatherspoons as loss payees. AMC was initially represented by counsel, but its attorney later withdrew. AMC has been unrepresented and has not participated in the litigation since that time. *See Smith v. Rustic Home Builders, LLC*, 2013 S.D. 9, ¶¶ 7–8, 826 N.W.2d 357, 359–60 (holding that corporations and limited liability companies may not appear pro se without a licensed attorney); *but see* SDCL 15-39-47 (providing a limited exception in small claims actions).

[¶7.] The Weatherspoons filed a motion for summary judgment, arguing that "[n]o genuine issue of material fact exists that [the Weatherspoons] are Loss Payees under the insurance policy subject to this action, and the Weatherspoons are entitled to judgment declaring their right to coverage as a matter of law." They also argued the insurance contract language surrounding the different loss payable clauses was ambiguous and that two of the individual clauses under the Loss Payable Clauses endorsement were at odds. The first clause among the four, designated as the Loss Payable Clause, did not appear to allow a loss payee to seek payment for a loss, but the second individual clause, the Lender's Loss Payable

Clause, did because it specifically allows loss payees to make their own claim for coverage if the insured did not.

[¶8.] In its response to the Weatherspoons' motion for summary judgment, Acuity argued that the contract language made it clear that "the Weatherspoons' rights are only equal to the rights of the policy holder, [AMC]." Acuity further argued that because AMC had not made a claim for damages, the Weatherspoons were not able to pursue loss benefits under the insurance contract. As support, Acuity cited the language of the individual Loss Payable Clause which provided that Acuity would first "adjust the loss" with AMC and then "[p]ay any claim for loss or damage *jointly* to [AMC] and the loss payee, as interests may appear." (Emphasis added.) Pointing to the schedule appearing after the Loss Payable Clauses endorsement, Acuity noted that the only clause listed under "Applicable Clause" was the Loss Payable Clause and not the Lender's Loss Payable Clause that the Weatherspoons hoped to invoke.

[¶9.] In addition, Acuity claimed that even if AMC had made a claim—and it eventually did—there could be no joint payment with AMC and the Weatherspoons because the claim would be denied under a "Dishonest or Criminal Act Exclusion" included within the insurance contract. Acuity argued that because Russel intentionally started the fire, coverage for the loss was excluded.

[¶10.] The circuit court denied the Weatherspoons' motion for summary judgment. The court concluded the insurance contract was unambiguous and that the Weatherspoons were not entitled to benefits under the contract because AMC had not submitted a claim for benefits.

[¶11.] Relying upon this reasoning, Acuity filed its own motion for summary judgment, asserting that coverage for the claimed losses was unavailable to both AMC and the Weatherspoons.[1] Acuity argued that AMC was not able to recover because it did not submit a timely claim for losses and, even if it had, the claim would have been denied under the dishonest act exclusion because Acuity's investigation had determined that Russel intentionally started the fire. As to this latter argument, Acuity noted that neither AMC nor the Weatherspoons had submitted expert evidence to refute the opinions of Rallis and Special Agent Hill.

[¶12.] The circuit court denied Acuity's motion for summary judgment in a memorandum opinion filed on September 30, 2022. The court noted that, while neither AMC nor the Weatherspoons offered expert testimony to refute the determinations that the fire was set intentionally by Russel, he had denied setting the fire during a pretrial deposition. Citing this Court's decision in *Johnson v. Albertson's*, 2000 S.D. 47, ¶¶ 25–26, 610 N.W.2d 449, 455, the circuit court reasoned that expert testimony could assist the trier of fact, but it could not supplant it. The court ruled "the weight of any expert opinion and factual disputes should be left to a jury."

[¶13.] The circuit court did not address the timeliness issue in its September 2022 decision, and Acuity filed a renewed motion for summary judgment, specifically asking the court to consider the untimeliness of AMC's claim filed over two years after the fire occurred. Acuity argued the insurance contract required

---

1. Acuity alternatively argued that the court should bifurcate the trial "between the issues of insurance coverage (i.e., Acuity's liability for any coverage owed to either party), and damages." The court denied this request.

that AMC provide "a signed, sworn proof of loss containing the information" that Acuity requested in a June 2018 letter.

[¶14.] In response, the Weatherspoons argued that Acuity had timely access to the fire damage and site and therefore Acuity suffered no prejudice as a result of the late claim. Further, the Weatherspoons argued that the Maxons submitted timely homeowners' insurance claims to Allstate Insurance and that Acuity was aware of these claims.[2] The Weatherspoons asserted that Acuity never intended to pay loss damages, regardless of whether or not they received sworn proof of loss.

[¶15.] At a June 2023 hearing, Acuity argued that "the Maxons did not complete that form simply because they were concerned that additional criminal charges could be brought" against them for insurance fraud. Acuity also claimed that the untimely proof of loss caused prejudice, arguing that "[Acuity's] ability to properly investigate this claim of course is going to be limited based upon the information [Acuity has] about how the fire started." Although Acuity admitted it had an investigator on site a few days after the fire, it argued that "[the investigation] was not sufficient enough for Acuity to simply be able to deny the claim and deny coverage."

[¶16.] The Weatherspoons primarily relied on the argument that their ability to collect under the insurance contract was not dependent on AMC. In an oral ruling, the circuit court denied Acuity's renewed motion for summary judgment because Acuity had not shown prejudice from the lack of timely notice.

---

2. Allstate was the insurer for the residence attached to T-Spoons.

[¶17.] The case was tried to a jury on July 17–19, 2023. The parties stipulated that the primary issues to be resolved were: 1) whether the fire was intentionally set by Russel, and 2) if not, the amount of damages owed by Acuity. Witnesses included Special Agent Hill, Chris Rallis, the Maxons, and the Weatherspoons, among others.

[¶18.] Acuity presented the testimony of Special Agent Hill via a videotaped trial deposition. Special Agent Hill's deposition was taken on May 9, 2023, in Sioux Falls. Counsel for all three parties were present, as well as an attorney from the Department of Justice (DOJ). During the deposition, counsel for AMC objected to some of Special Agent Hill's testimony, arguing the testimony was outside the scope of the permission granted by the DOJ. The Weatherspoons' attorney did not join in the objection, and the DOJ attorney did not express any concern about the scope of the testimony.

[¶19.] Prior to playing the trial deposition video, the Weatherspoons sought a ruling on the scope-of-DOJ-permission objection previously made by AMC's former attorney. The Weatherspoons also claimed that Special Agent Hill's expert testimony was not disclosed in a timely manner before trial. Acuity opposed the Weatherspoons' objections and argued that the Weatherspoons could not pursue a ruling for an objection they had not noted at the time of the deposition. Acuity also pointed to the fact that the DOJ attorney had not asserted that Special Agent Hill's testimony exceeded the DOJ's permission. The court overruled the objection, and the video deposition was presented to the jury.

[¶20.] Special Agent Hill testified that he is a certified fire investigator and related his training, education, and experience regarding fire investigations. He is also a federal law enforcement agent, and he explained that the Bureau of Indian Affairs contacted him on April 15, 2018, because the T-Spoons building fire occurred within the exterior boundaries of the Standing Rock Indian Reservation.[3] Special Agent Hill arrived at the scene on April 15 around 11:00 a.m. and began his investigation. He spoke to Russel and multiple first responders, and he also was able to examine the interior of the building where the fire occurred. After examining the scene, Special Agent Hill was able to determine that the fire had started in the basement and had originated in multiple locations. He also found plastic water bottles in the basement that contained gasoline. Following his investigation, Special Agent Hill determined that the fire had been intentionally started. He also believed Russel had been responsible because "there was nobody else present" in the building before the fire started.

[¶21.] Acuity hired its own fire investigator, Rallis, who also testified at trial. Rallis stated that he owns an investigation business and has "worked thousands" of fire and explosive investigations. He went to the fire scene and completed an "origin and cause investigation" of the fire on April 18, 2018, and revisited the scene a few weeks later on May 11. During his investigation, Rallis spoke with Russel

---

3. The Corson County Sheriff testified at trial that he responded to the fire, but any criminal action against Russel Maxon was beyond state jurisdiction because Russel is an enrolled member of the Standing Rock Sioux Tribe. *See* 18 U.S.C. § 1153 (Major Crimes Act listing arson among other crimes subject to federal enforcement).

who said that he had been in the building doing laundry in the basement before the fire started.

[¶22.]    Rallis opined that there were multiple points of origin for the fire, starting "near the back door, down the stairway and into the basement area and throughout the basement area." Rallis also determined the fire started and was spread using "a trailer and booster technique[,]" which he explained in the following terms:

> In fire parlance, that means that boosters, being fuel sources. They can either be dry combustibles to promote the development of the fire, or they can be gasoline or a variety of accelerants. Those are boosters. And trailers end up being the method of spreading the fire from one booster to another booster, or from where the match, let's say, was struck to the next booster, and this is all designed to promote the spread of the fire in the - - throughout the area that it's used in, and I observed multiple instances of boosting and trailing technique.

Rallis took several samples of the areas where he determined the trailer and booster method was used and sent them to a forensic lab in Atlanta, Georgia. The lab results showed that "gasoline was present in all of those samples."[4]

[¶23.]    As part of his investigation, Rallis eliminated other accidental ways in which the fire could have started and also noted there were no signs of burglary or intrusion into the building. Ultimately, Rallis concluded the fire was intentionally started. And while he did not definitively testify that Russel started the fire, Rallis did acknowledge that Russel was the only person with access to the basement prior

---

4.    The record does not indicate whether the T-Spoons building was a total loss, but it does establish that it did not burn to the ground. Rallis explained that, though the booster and trail design was "well constructed," the fire had essentially burned itself out, or nearly so, because it did not have sufficient oxygen to spread further than it did.

to the fire. Rallis also believed that Russel had a "[f]inancial motive" to start the fire.

[¶24.] Tracy Maxon testified regarding her involvement as a co-owner of T-Spoons. She discussed the contract for deed with the Weatherspoons as well as AMC's insurance contract with Acuity. A focal point of Tracy's testimony surrounded the financial status of the Maxons and T-Spoons. When asked whether the Maxons had ever had checks not honored because of insufficient funds, Tracy admitted that it had happened on two occasions, one to the Weatherspoons and one to "the guy in Pierre" who worked as a beer distributor.

[¶25.] Tracy had previously given sworn testimony in January 2020 in which she said that the Maxons' financial condition was worsening, that they had many checks dishonored for insufficient funds, and that beer distributors would no longer deliver to T-Spoons because of the bad checks.[5] Acuity used these prior inconsistent statements to impeach Tracy.

[¶26.] The Weatherspoons objected to the admission of the prior testimony, but Acuity reiterated that it was merely seeking to use the prior testimony for impeachment. The circuit court agreed that the testimony could be used for impeachment, but at various points in the effort to impeach Tracy, she simply read her prior answer from a transcript without first providing an answer that could then be impeached. The Weatherspoons objected to several, but not all, of these instances, and the circuit court sustained those objections. The court instructed

---

5. The testimony was given in connection with a separate proceeding in North Dakota involving Allstate.

Tracy to not preemptively read her earlier answers, and eventually, Acuity conducted the impeachment in this way.

[¶27.]     In his testimony, Russel explained that he had been the only person at T-Spoons the day of the fire.  He was in the basement attempting to fix one of his boots with glue using a propane heater and left the basement around 2:00 a.m. When asked why he was storing gas in the basement Russel replied that "somebody was stealing my gas, so I put it downstairs."  On cross-examination, Russel was asked whether he "intentionally set fire to the T-Spoons business."  He responded, "No."

[¶28.]     The Weatherspoons both testified at the trial.  Tammy was not present, so counsel for Acuity read portions of her prior deposition during its case-in-chief.  The Weatherspoons called Greg, who discussed the contract for deed and also detailed when Acuity denied the Weatherspoons' claim for loss damages as loss payees.

[¶29.]     Acuity and the Weatherspoons each moved for judgment as a matter of law.  The Weatherspoons, asserting nearly identical arguments to those in their 2019 motion for summary judgment, argued the terms of the insurance contract are ambiguous and that the language should be construed liberally in their favor.  The circuit court denied the Weatherspoons' motion, ruling the contract was unambiguous, the Weatherspoons' claim was dependent on AMC, and that the dishonesty or criminal acts exclusion was applicable to the Weatherspoons' claim. Using this analysis, the circuit court granted Acuity's motion for judgment as a matter of law on the Weatherspoons' counterclaim, concluding "there is no . . . legal

basis to present this breach of contract claim to the jury under these circumstances[.]"

[¶30.] Following its deliberation, the jury returned a verdict in which ten of the twelve jurors found it was more likely than not that Russel intentionally started the fire. The Weatherspoons now appeal and raise three issues that we restate as follows:

1. Whether the circuit court erred when it granted Acuity's motion for judgment as a matter of law and denied the Weatherspoons' motion for judgment as a matter of law.

2. Whether the circuit court abused its discretion when it admitted expert testimony from Special Agent Derek Hill's trial deposition.

3. Whether the circuit court abused its discretion when it permitted Acuity to impeach Tracy Maxon with prior inconsistent statements.

## Analysis

### *The Loss Payable Clause*

[¶31.] The parties' corresponding motions for judgment as a matter of law implicate certain operative provisions of the AMC-Acuity insurance contract. Our interpretation of this text involves a legal question we review de novo. *See W. Agric. Ins. Co. v. Arbab-Azzein*, 2020 S.D. 12, ¶ 8, 940 N.W.2d 865, 868 (citation omitted).[6]

[¶32.] "[W]hen interpreting a contract, this Court looks to the language that the parties used in the contract to determine their intention." *Suvada v. Muller*, 2022 S.D. 75, ¶ 28, 983 N.W.2d 548, 558 (citation omitted). "In order to ascertain

---

6. We also review a circuit court's decision to grant or deny a motion for judgment as a matter of law de novo. *Matter of Estate of Tank*, 2023 S.D. 59, ¶ 38, 998 N.W.2d 109, 122.

the terms and conditions of a contract, we examine the contract as a whole and give words their plain and ordinary meaning." *Id.*

[¶33.] The Weatherspoons are not parties to the AMC-Acuity contract. They are loss payees whose ability to assert a claim is governed by a key provision of the contract, an endorsement entitled "Loss Payable Clauses" which, as indicated above, includes four individual clauses that apply to different types of loss coverage: 1) the Loss Payable Clause; 2) the Lender's Loss Payable Clause; 3) the Contract of Sale Clause; and 4) the Building Owner Loss Payable Clause. Notably, before the four clauses are listed, the Loss Payable Clauses endorsement reads, "The following is added to the Loss Payment and Valuation Loss Condition, *as indicated in the Schedule*[.]" (Emphasis added.) The schedule itself immediately follows the Loss Payable Clauses endorsement and reads as follows:

| | | SCHEDULE | | |
|---|---|---|---|---|
| Premises Number | Building Number | Description of Property | | |
| 001 | 001 | | | |

| Premises Number | Building Number | Loss Payee (Name and Address) | Loan Number | Applicable Clause |
|---|---|---|---|---|
| 001 | 001 | GREG & TAMMY WEATHERSPOON PO BOX 682 MCLAUGHLIN SD 57642 | | LOSS PAYABLE |

[¶34.] The "Loss Payable" clause listed in the schedule as the "applicable clause" is a reference to the first of the four individual clauses, which provides as follows:

> For Covered Property in which both you [AMC] and a Loss Payee [the Weatherspoons], shown in the Schedule, have an insurable interest, we will:
>
> a. Adjust losses with you; and

> b. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

[¶35.] The circuit court determined that "jointly," as used in Paragraph 1(b), restricted the Weatherspoons' ability to collect to the extent that AMC could collect. We agree. Not only does a plain reading of the text yield this result, but reading the other loss payable clauses further supports the view that the Weatherspoons' claim under the Loss Payable Clause is dependent on AMC.

[¶36.] For instance, Paragraph 2(b)(3) of the Lender's Loss Payable Clause states in relevant part:

> If we deny your claim because of your acts or because you have failed to comply with the terms of this policy, the Loss Payee will *still have the right to receive* loss payment if the Loss Payee:
>
> (a) Pays any premium . . . ;
>
> (b) Submits a signed, sworn proof of loss . . . ; and
>
> (c) Has notified us of any change in ownership.

(Emphasis added.)

[¶37.] Though we make no definitive holding, this text appears to permit loss payees to collect even if the insured was excluded by dishonest acts, as the circuit court recognized. However, the Lender's Loss Payable Clause is not the clause designated in the schedule following the Loss Payable Clauses endorsement; the Loss Payable Clause is, and it, just as clearly, does not include language that allows a loss payee to assert its own claim. As a result, the Loss Payable Clause only permits payment for loss jointly between the insured and the loss payee. Therefore, as loss payees under Section 1, the Weatherspoons were only permitted to collect if

and when AMC collected, and, consequently, the circuit court did not err when it granted Acuity's motion for judgment as a matter of law.

[¶38.] The Weatherspoons further argue their "loss payable" designation creates an ambiguity because, in their words, "Section 1 -- entitled, 'Loss Payable Clause,' -- bears the same title as the entire endorsement -- entitled, 'Loss Payable Clauses.'" Therefore, they argue we "should determine that the endorsement is ambiguous and that the entire endorsement applies to [the] Weatherspoons[,]" including the Lender's Loss Payable Clause.[7]

[¶39.] After our de novo review, we conclude the language of the insurance contract is not ambiguous. While the endorsement title "Loss Payable Clauses" is similar to the designation for the individual "Loss Payable Clause," the two are distinct and unambiguous. The endorsement title is phrased as a plural designation that includes all four enumerated loss payable clauses, including the singularly designated Loss Payable Clause. This clause alone is incorporated into the schedule, appearing under another heading "Applicable Clause"—also a

---

7.    The Weatherspoons point to an unpublished opinion from the Court of Appeals of Michigan as support for their argument. *See KEN Holdings, LLC v. Auto-Owners Ins. Co.*, No. 325427, 2016 WL 6496096 (Mich. Ct. App. Nov. 1, 2016). Despite some similarities, the insurance contract at issue in *KEN Holdings* was different in one key respect—there was no schedule that restricted the applicability of multiple enumerated loss payable provisions, as there is here. As a result, the court concluded "[w]hich one applies to a given interested party's loss is governed by the terms of those provisions." *Id.,* at *3. By contrast, the Loss Payable Clauses endorsement in the Acuity policy specifically incorporates the schedule which lists only the Loss Payable Clause as the "Applicable Clause"—not the Lender's Loss Payable Clause that the Weatherspoons seek to apply.

singular designation. Therefore, we cannot accept the Weatherspoons' argument that "[n]othing in the policy states that only one of the four sections is applicable."[8]

[¶40.] The Weatherspoons make an additional argument in which they claim they are entitled to enforce the Acuity insurance contract as third-party beneficiaries, but this claim is unsustainable given our analysis of the Loss Payable Clauses endorsement. Even if the Weatherspoons could successfully claim they were third-party beneficiaries, their ability to enforce the contract is only as useful as the terms of the contract, which we have concluded do not afford coverage to them solely as loss payees.

[¶41.] Following deliberation, the jury returned a verdict that found Russel had intentionally started the fire at T-Spoons on April 15, 2018. Pursuant to the dishonesty or criminal acts exclusion within the insurance contract, AMC was therefore precluded from collecting loss damages. And the Weatherspoons have not appealed the jury's verdict.[9] The circuit court's decisions regarding judgment as a matter of law were not in error, and therefore, are affirmed.

---

8. The Weatherspoons also seem to claim, although in passing, that they were erroneously precluded from arguing ambiguity and contract construction to the jury, stating that the "Weatherspoons were prejudiced by not having an opportunity to ascertain contractual intent and the objection of the parties in relation to the policy." We read the record differently. The genesis of this case is rooted in contract interpretation, and the Weatherspoons were able to present their interpretation to the jury multiple times during the trial over Acuity's objections. The circuit court's specific decision to refuse a jury instruction regarding ambiguity and contract interpretation was not an abuse of discretion. Whether a contract is ambiguous is a question of law to be determined by the court, not the jury.

9. Nor have the Weatherspoons challenged the determination that the provisions of dishonest acts exclusion, if applicable, would prevent coverage to AMC.

***Special Agent Hill's expert testimony***

[¶42.]    "We review evidentiary rulings for abuse of discretion." *Powers v. Turner Cnty. Bd. of Adjustment*, 2022 S.D. 77, ¶ 9, 983 N.W.2d 594, 599 (citation omitted). Our review of a circuit court's evidentiary rulings consists of a "two-step process." *Sedlacek v. Prussman Contracting, Inc.*, 2020 S.D. 18, ¶ 16, 941 N.W.2d 819, 822. "First, we 'determine whether the trial court abused its discretion in making an evidentiary ruling.'" *Id.* "[S]econd, we determine 'whether this error was a *prejudicial error*[.]'" *Id.* (alteration in original). "For expert testimony, this Court adopted the test from *Daubert v. Merrell Dow Pharmaceuticals, Inc.*" *Powers*, 2022 S.D. 77, ¶ 9, 983 N.W.2d at 599 (internal citation omitted).

[¶43.]    Expert testimony is governed by SDCL 19-19-702 (Rule 702), which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    The testimony is based on sufficient facts or data;
>
> (c)    The testimony is the product of reliable principles and methods; and
>
> (d)    The expert has reliably applied the principles and methods to the facts of the case.

We require "'the proponent offering expert testimony [to] show that the expert's theory or method qualifies as scientific, technical, or specialized knowledge' as

required under Rule 702." *Tosh v. Schwab*, 2007 S.D. 132, ¶ 18, 743 N.W.2d 422, 428.

[¶44.] Here, the Weatherspoons do not appear to argue that Special Agent Hill's expert opinion as to whether the fire was intentionally started was improper. Rather, the Weatherspoons argue that "nobody presented evidence of the expert's knowledge, skill, experience, training, or education *in identifying persons responsible* for fires." (Emphasis added.) Further, they argue that Special Agent Hill "did not state what facts or data supported his belief and did not state what methods and principles he applied to arrive at his opinion."

[¶45.] During his trial deposition, Special Agent Hill testified that "I believed that [Russel] had probably been responsible for it just based on where he was located, where his last statement put him, and the timeline" and that Russel was the only person that could have caused the fire. While determining who started the fire in this circumstance may not even constitute expert testimony, it appears from the record that Special Agent Hill established that his opinion was based on a reliable foundation.

[¶46.] However, even if the admission of Special Agent Hill's opinion that Russel started the fire was error, it appears from the record that the Weatherspoons would not be able to prove prejudice. Rallis, the other fire expert, provided conclusions that were consistent with those of Special Agent Hill, and Rallis also added that Russel had a financial motive to start the fire. This testimony from Rallis is not challenged on appeal which means the jury would have had evidence of Russel's culpability regardless of Special Agent Hill's testimony.

***Impeachment of Tracy using prior inconsistent statements***

[¶47.]     It is well-settled that "[e]ven when the prior inconsistent statement is ordinarily inadmissible, it may be admitted for the limited purpose of impeaching the witness under SDCL 19-19-613(b)." *State v. Little Long*, 2021 S.D. 38, ¶ 33, 962 N.W.2d 237, 250.  "In order '[t]o properly impeach, the prior statement must be inconsistent with the witness's current testimony and it must not be on a collateral issue.'" *Id.* ¶ 34 (alteration in original) (citation omitted).  "The witness may be asked if 'he or she made the prior statement without disclosing its contents to the witness.'" *Id.* (citing SDCL 19-19-613(a)).  "But upon request, the statement must be shown to opposing counsel." *Id.* (citing SDCL 19-19-613(a)).  "If the witness admits making the statement, no further foundation is necessary." *Id.* (citation omitted).  "Should the witness deny making the statement, however, extrinsic evidence may be introduced to prove that the witness made an inconsistent statement." *Id.* (citing SDCL 19-19-613(b)).

[¶48.]     The Weatherspoons contend that the use of the prior statements was improper because "Acuity recited portions of the prior recorded statement and directed the witness to read from the statement."  After a review of the transcript, it appears Acuity and Tracy initially read portions of her prior statements during the testimony.  Under the circumstances here, this was improper.

[¶49.]     However, the Weatherspoons frequently objected to this method of impeachment, and the circuit court *sustained* these objections.  The court also instructed Acuity's counsel and Tracy to use a question-and-answer method before referring to the prior statements that were being used to impeach Tracy.  Because

the Weatherspoons prevailed on these objections, we have no adverse decisions to review. *See State v. Black Cloud*, 2023 S.D. 53, ¶ 34, 996 N.W.2d 670, 680 (holding that a prevailing party generally cannot appeal a favorable ruling) (citing *Hercules Inc. v. AIU Ins. Co.*, 783 A.2d 1275, 1277 (Del. 2000)).

[¶50.]     The Weatherspoons also argue that the prior statements were not properly given under oath, Tracy was not subject to cross-examination, and there was no notice that they would be used. These considerations seem better suited to a case in which the prior statements were being introduced as substantive evidence. *See* SDCL 19-19-801(d)(1) (stating that a witness's prior statement is admissible as non-hearsay if the witness testifies, is subject to cross-examination regarding the prior statement, and the statement is "inconsistent . . . and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition").

[¶51.]     Here, however, the prior statements were used solely for impeachment, which requires only that the witness admit they made the statement and then be given a chance to explain or deny the statements. *See Little Long*, 2021 S.D. 38, ¶ 34, 962 N.W.2d at 250; *see also* SDCL 19-19-613(b). Contrary to the Weatherspoons' assertions, those requirements were all satisfied here. Tracy was asked if she made those statements and then she was given an opportunity to explain the statements.

**Conclusion**

[¶52.]     The Weatherspoons' ability to recover under the AMC-Acuity policy as loss payees depends upon AMC's ability to recover. But because the jury found that Russel intentionally started the fire, AMC was precluded from receiving loss

benefits.  Therefore, Acuity could, and did, properly deny the Weatherspoons' claim for loss damages.  The court also acted within its discretion when it allowed Special Agent Hill's testimony about Russel's role in the fire.  And, finally, there is nothing to justify reversal on the basis of Tracy's impeachment.  It appears the court sustained the Weatherspoons' objections and redirected Tracy and Acuity's counsel to a proper method of impeachment.

[¶53.]    Affirmed.

[¶54.]    JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.